NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 98

No. 2016-063

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Franklin Unit, |
| | Criminal Division |
| | |
| Matthew Webster | April Term, 2017 |

Alison S. Arms, J.

Thomas J. Donovan, Jr., Attorney General, and David Tartter, Special Assistant Attorney
  General, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua S. O'Hara, Appellate Defender, Montpelier, for
  Defendant-Appellant.


PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Dooley, J. (Ret.),
         Specially Assigned


¶ 1.    **EATON, J.**  Defendant appeals his convictions for second-degree murder, reckless endangerment, and careless and negligent operation following a trial by jury. Defendant challenges the denial of his motion to suppress statements he gave to the police following his arrest, an evidentiary ruling at trial permitting certain expert testimony, the trial court's refusal to charge voluntary manslaughter, the denial of his motion for a new trial based on the prosecutor's statements in closing argument, and the trial court's imposition of a sentence of forty years to life on the murder conviction. We affirm.

¶ 2.     Defendant claims errors related to various stages of the proceedings, and the facts common to all of his claims are as follows. During the afternoon of September 25, 2013, defendant was involved in an argument with his then-wife over defendant's continuing contact with another woman, with whom he had been having an affair for about a year. Defendant's wife had been aware of the affair for about nine months. Despite defendant's assurances to his wife he would end his relationship with the other woman, he had not. The fight with his wife on this day began during a telephone call that defendant made to his wife as he was driving to meet the other woman, ostensibly to deliver the news that their affair was over. Defendant picked up the other woman at her apartment and drove to a parking area so they could talk. Defendant parked out of sight because his wife was threatening to come to the other woman's apartment. While defendant was talking with the other woman, his wife called defendant several times, yelling at him and threatening to "kick [the other woman's] ass." Eventually, defendant dropped the other woman off at her apartment. While doing so, defendant noticed his wife parked nearby.

¶ 3.     After leaving the apartment, defendant and his wife met at a gas station on Main Street in St. Albans, where she told him she was angry and sick of the situation. During their conversation, she took off her wedding rings, as she had done during previous arguments. Although his wife wanted to continue talking, defendant wanted to go to his father's house. Defendant left the gas station, driving north on Main Street at a high rate of speed. Defendant's wife followed a distance behind him in her car.

¶ 4.     At the intersection of Main Street and Lower Newton Road in downtown St. Albans, defendant ran a red light. At this same time, a car being driven by Anna Alger, accompanied by her fiancé, was attempting to turn left onto Main Street from Lower Newton Road and was cut off by defendant's car. Alger was able to avoid a collision and, as defendant's car passed, she made a gesture of arrant disdain at him with her middle finger. Defendant's wife saw defendant run the red light and called him to tell him about it, but he did not answer his phone.

2

¶ 5.    Shortly after passing through the intersection, defendant pulled his car to the side of the road and stopped.  Alger pulled in behind him and also stopped.  Unbeknownst to Alger, defendant had been contemplating shooting himself and had been driving with a loaded nine-millimeter pistol on his lap.  Both defendant and Alger got out of their cars, with defendant carrying his pistol.  Alger began walking toward defendant, and as she did so, she waved her arms and pointed at him, yelling, "[W]hat kind a piece of shit do you think you are?"  When Alger got within about six feet of defendant, he opened fire with his pistol, firing up to eleven shots while emptying the clip.  Alger was hit seven or eight times.  He put another clip into the pistol while Alger's fiancé got out of their car.  Defendant pointed the gun at Alger's fiancé and pulled the trigger, but the gun did not fire.  As defendant ran away, Alger's fiancé summoned help from a passerby and went to check on Alger.  She was already dead.  The shooting, which occurred shortly after 5:00 p.m., was seen by several witnesses, including defendant's wife, who went up to him after the shooting, and saw him point the pistol at his head and pull the trigger.  Again, the pistol did not fire.  Defendant's wife took the pistol from him, as well as a second one he was carrying.  The St. Albans police arrived at the scene very shortly after the incident and arrested defendant.

## I. Motion to Suppress

¶ 6.    Defendant moved to suppress statements he gave to a detective at the police station because, according to defendant, he did not knowingly and voluntarily waive his Fifth Amendment rights.  Specifically, defendant argues that he invoked his right to counsel when, following his arrest, he asked the detective who was interrogating him, "[W]ould they be able to come right now so I could talk to you, lawyer?"  According to defendant, the detective's "nonanswer" to his "direct question" violated the requirements of Miranda v. Arizona, 384 U.S. 436 (1966), and Vermont's Public Defender Act (PDA), 13 V.S.A. § 5237.[1]

_____

[1]  In his suppression motion, defendant also asserted violations of the Sixth Amendment, the Due Process Clause of the Fourteenth Amendment, and Article 10 of the Vermont Constitution

3

¶ 7.     After the shooting, a police detective arrested defendant and took him to the St. Albans Police Department.  Shortly after 6:00 p.m., an officer, Detective Couture, introduced himself to defendant as a detective and brought defendant into an interview room.  The following exchange took place:

> [Defendant]:  Hello.
>
> DET. SGT.  COUTURE: Hi.
>
> [Defendant]:  I'm Matt.
>
> DET. SGT. COUTURE:  Are you Matt?
>
> [Defendant]:  I was pulled over to let her go by because I was going to kill myself.
>
> DET. SGT. COUTURE:  Okay.  Hang on, hang, hang on.
>
> [Defendant]:  Then she got out.
>
> DET. SGT. COUTURE:  Wait, wait, wait, wait.
>
> [Defendant]:  Are you a doctor?
>
> DET. SGT. COUTURE:  No, I'm a detective.
>
> [Defendant]:  I didn't take any of my medication in the morning.  I'm sick.  I don't feel well at all.  (indiscernible)
>
> DET. SGT. COUTURE:  Okay.
>
> [Defendant]:  I didn't mean it.  I didn't mean anything.
>
> DET. SGT. COUTURE:  Can I, can I talk to you?
>
> [Defendant]:  I'm sorry.  I'm sorry.
>
> DET. SGT. COUTURE:  Can I talk to you?  Okay.
>
> [Defendant]:  I'm sorry.
>
> DET. SGT. COUTURE:  Okay.

---

as grounds for suppression of his statements.  He does not pursue these grounds on appeal, and we do not consider them.

4

[Defendant]: I'm sorry.

. . . .

[Defendant]: I was trying—I'll tell you everything.

DET. SGT. COUTURE: Okay.

[Defendant]: I'll tell you everything.

DET. SGT. COUTURE: Okay.

[Defendant]: I swear to God I won't give you any problem. I swear to God.

DET. SGT. COUTURE: Okay.

[Defendant]: I'm so sorry. I'm so sorry. (indiscernible)

. . . .

DET. SGT. COUTURE: We just need to figure out what's going on, okay?

[Defendant]: I'm going to—it's been—my counselor—.

DET. SGT. COUTURE: Okay. Hang on. Yeah, right here.

[Defendant]: My counselor quit. My counselor quit, and then I (indiscernible) I'm so sorry.

DET. SGT. COUTURE: Hang on. Hang on. Okay. In order for me to talk to you, okay, I got to read what is called the Miranda warning, okay?

[Defendant]: Okay. Yup. Yup.

DET. SGT. COUTURE: I am a detective with the St. Albans Police Department, okay?

[Defendant]: Okay.

. . . .

[Defendant]: I'm so—I used to be such a good—I didn't never—I never done anything wrong. I mean, I got in a car accident, and I got a careless and negligent out of it. This—I swear to God—

DET. SGT. COUTURE: What's your name?

5

[Defendant]:  Is she okay?  Matt Webster.

. . . .

DET. SGT. COUTURE:  Okay.  Before I go any further, I've got to read you what's called the <u>Miranda</u> warning.

[Defendant]:  I've seen it on TV, yeah.

. . . .

DET. SGT. COUTURE:  So in order for me to talk to you and find out exactly what happened today, I got to read this to you.  Okay?

[Defendant]:  Okay.

DET. SGT. COUTURE:  So what's your date of birth, Matt?

[Defendant]:  It's August 7, 1983.

DET. SGT. COUTURE:  And today's date is September 25th—

[Defendant]:  Do you believe that I didn't mean to do it?  I'm so stupid.

DET. SGT. COUTURE:  And the time is 18:25 hours.  Okay.

[Defendant]:  I'll tell you everything.

DET. SGT. COUTURE:  Okay.

[Defendant]:  Anything you want to know, I'll tell you.

DET. SGT. COUTURE:  Okay.  Are you going to be able to calm down for me, where I feel comfortable enough where I can take these two off?

[Defendant]:  Yeah, definitely.

DET. SGT. COUTURE:  All right

[Defendant]:  Definitely.  I swear to God—I'm seriously—I will do whatever.  I mean, one of the reasons obviously—

. . . .

6

[Defendant]: I just—I just—is my wife okay? Sorry. I don't—I don't—she was in the orange car. She was behind me, or not behind me.

DET. SGT. COUTURE: Okay. Okay. Okay. Go—yeah. Before we go any further, I've got to explain your <u>Miranda</u> warnings. Okay?

[Defendant]: Okay.

DET. SGT. COUTURE: You have the right to remain silent. Do you understand?

[Defendant]: Yes, sir.

DET. SGT. COUTURE: Anything you say can be used against you in a court of law. Do you understand?

[Defendant]: Yes, sir.

DET. SGT. COUTURE: You have the right to be represented and talk to a lawyer before questioning and have one present with you during questioning. Do you understand?

[Defendant]: Yes, sir.

DET. SGT. COUTURE: If you cannot afford to hire a lawyer, one will be appointed to you to represent you at public expense before any questioning, if you wish. In Vermont it's called a public defender. Understand?

[Defendant]: Yup. Yes, sir.

DET. SGT. COUTURE: If you decide to answer my questions, you may stop the questioning at any time. Do you understand?

[Defendant]: Yes, sir.

DET. SGT. COUTURE: Do you understand each of these rights I've explained to you?

[Defendant]: Yes, sir.

DET. SGT. COUTURE: Do you want to be represented by a lawyer and have one present during questioning? That's a two-part question, so. I wouldn't even talk to you, you know.

[Defendant]: It's—there's—I guess—I got to know if she's okay.

7

DET. SGT. COUTURE:  So do you want to talk to me?

[Defendant]:  I should, right?  It's better—it's better that way, I think.  I don't know.  I don't know.  I should.  Yes.  Yes.

DET. SGT. COUTURE:  Okay.

[Defendant]:  Yes, sir.  I wish to talk to you.

. . . .

DET. SGT. COUTURE:  Okay.  "I've been advised of my rights. I understand them.  No threats or promises have been made against me.  Knowing my rights, I agree to waive them.  I waive my right to be represented by a lawyer and to talk to one prior to questioning and to have a lawyer present during questioning.  Knowing my rights, I agree to waive them and talk to you now."  Now, what I'm asking you to do, Matt, if you could, is to sign right here.

[Defendant]:  Yeah.

DET. SGT. COUTURE:  All it is saying is that you agree to speak to me.  That's all it is.

[Defendant]:  I guess I'm just—I'm afraid because, you know, I don't know laws too well.

DET. SGT. COUTURE:  Um-hum.

[Defendant]:  I guess.  I want to be one hundred percent honest with you and everything too.  I know—

DET. SGT. COUTURE:  Okay.  Well, in order for me to talk to you—

[Defendant]:  Okay.

DET. SGT. COUTURE:  —I mean, you have to waive your rights. Okay?  It's up to you on whether or not you want to waive your rights.  There's two sides to every story.  And I know that.  You know that.  Okay?  And I don't know what really happened, okay?

[Defendant]:  I was—okay.

DET. SGT. COUTURE:  But, in order for me to get your side of the story, I do need to talk to you.  Okay?

[Defendant]:  I hope (indiscernible)—

8

DET. SGT. COUTURE: So, I mean, it would be—I mean—

[Defendant]: I want to do the right—I want to do the right thing. But I don't know if the right thing is to get a—would they be able to come right now, so I could talk to you, lawyer? I don't know.

DET. SGT. COUTURE: Man, I can't give you that advice.

[Defendant]: Right.

DET. SGT. COUTURE: You know?

[Defendant]: Hard—

DET. SGT. COUTURE: I mean there's two sides to every story. There really are. You know? And I think whatever—

[Defendant]: I just—I don't—as a man, I don't want you to look less at me, you know, if I choose to like, if I should say I'd like to get the lawyer. I do—I want to help you. I need to tell you what happened.

Defendant further stated he wanted to talk with Sgt. Couture because "it's the right thing to do and I just know somebody is going to holler at me later for it probably." Thereafter, defendant signed the form waiving his Miranda rights and gave the detective a statement concerning his involvement in the shooting.

¶ 8. Defendant challenges the court's denial of his motion to suppress these statements under both the PDA, 13 V.S.A. § 5237, and Miranda, 384 U.S. at 436. In reviewing a denial of a motion to suppress, we will not set aside findings of fact unless clearly erroneous. State v. Nault, 2006 VT 42, ¶ 7, 180 Vt. 567, 908 A.2d 408 (mem.). We review the court's legal conclusions de novo. State v. Lawrence, 2003 VT 68, ¶ 8, 175 Vt. 600, 834 A.2d 10 (mem.).

¶ 9. As a threshold matter, we reiterate that "[t]he PDA does not establish a set of substantive rights in addition to the Miranda right to have counsel present at questioning. Nor does it provide any greater right to counsel to a needy person than to any other individual." State v. Robitaille, 2011 VT 135, ¶ 14, 191 Vt. 91, 38 A.3d 52 (quotation omitted). Our analysis

9

therefore focuses on the underlying constitutional principles at which <u>Miranda</u>, and by extension the PDA, are aimed.

¶ 10.   <u>Miranda</u> and the portions of the PDA on which defendant relies are prophylactic safeguards intended to protect an individual's right against self-incrimination by minimizing the "inherently compelling pressures" of "custodial questioning."  See <u>Miranda</u>, 384 U.S. at 457, 467; <u>State v. Provost</u>, 2005 VT 134, ¶ 7, 179 Vt. 337, 896 A.2d 55 (acknowledging that PDA "recognizes <u>Miranda</u>'s concern for bad faith interrogation of individuals accused of a crime without the presence of counsel, and reflects this state's policy of securing for those individuals an immediate right to counsel" (quotation omitted)).  Because custodial interrogation, by its nature, "work[s] to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," the <u>Miranda</u> warnings are a prerequisite to securing the accused's informed and voluntary waiver of his rights.  <u>Miranda</u>, 384 U.S. at 467.  However, the protections detailed in <u>Miranda</u> and the PDA only attach when a suspect is actually subjected to custodial interrogation, meaning " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " <u>State v. Manning</u>, 2015 VT 124, ¶ 23, 200 Vt. 423, 132 A.3d 716 (quoting <u>Miranda</u>, 384 U.S. at 444).

¶ 11.   Here, defendant made several apologies and incriminating statements before he was subjected to interrogation, and those statements were therefore made outside the scope of <u>Miranda</u>'s protections.  Specifically, although it is undisputed that defendant was in custody when he was at the police station in an interrogation room, defendant himself initiated a discussion of the crime of which he was accused before the officer could give him <u>Miranda</u> warnings.  In fact, the officer repeatedly asked defendant to "wait" and instructed him to "[h]ang on" so that the officer could "read what is called the <u>Miranda</u> warning."  These statements were not a result of the inherently compelling forces of custodial interrogation, and therefore, would have been admissible even if defendant's arguments were otherwise correct.  See <u>State v. Picknell</u>, 142 Vt. 215, 222,

10

454 A.2d 711, 713 (1982) (noting that statements are admissible without prior Miranda warnings if they were "freely volunteered without compelling influences").

¶ 12. Defendant also seeks to suppress statements that he made after the officer gave him the Miranda warnings. According to defendant, the officer's "nonanswer" to defendant's "direct question about his right to counsel failed to advise [defendant] that, under Miranda and [the PDA], [defendant] could consult with an attorney at all times, before and during questioning." This argument has two distinct dimensions. First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Robitaille, 2011 VT 135, ¶ 28 (acknowledging that valid waiver of right to counsel must be voluntary, knowing, and intelligent). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421. Only where "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quotation omitted); see also Robitaille, 2011 VT 135, ¶ 28 (waiver analysis depends on "the particular facts and circumstances surrounding [each] case, including the background, experience, and conduct of the accused" (quotation omitted)). The state bears the "heavy burden" of establishing a valid waiver of Miranda rights by a preponderance of the evidence, and the court "must indulge in every reasonable presumption against waiver." State v. Caron, 155 Vt. 492, 501-02, 506, 586 A.2d 1127, 1133, 1135 (1990) (quotation omitted).

¶ 13. On the other hand, however, "[i]nvocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). The inquiry is objective. Id. at 458-59. Thus, "if a suspect makes a reference to an attorney that is ambiguous or

11

equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel," there is no constitutional requirement that officers cease questioning. <u>Id</u>. at 459 (emphasis in original). For example, in <u>Davis v. United States</u>, the U.S. Supreme Court held that a suspect who was in custody and who was subjected to interrogation following receipt of the <u>Miranda</u> warnings did not invoke his right to counsel when he remarked to a federal agent, "Maybe I should talk to a lawyer." <u>Id</u>. at 462. The Court in <u>Davis</u> "decline[d] to adopt a rule requiring officers to ask clarifying questions" and instead reinforced that when a suspect's statement "is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." <u>Id</u>. at 461-62.

¶ 14. Additionally, we have been clear in our case law that the purpose of an "immediate" right to an attorney under the PDA must be considered in context. <u>Robitaille</u>, 2011 VT 135, ¶ 25. If a person is detained, the PDA requires that a public defender be contacted at the commencement of detention unless the defendant voluntarily, knowingly, and intelligently waives that right. 13 V.S.A. § 5234(a)(2). But contact at the "commencement of detention" does not mean the first thing that a police officer must do upon detaining a defendant is to contact an attorney. <u>Robitaille</u>, 2011 VT 135, ¶ 13. Even in the face of a clear invocation of the right to counsel, we have held that a fifteen-minute delay in contacting an attorney did not run afoul of the PDA. <u>Id</u>. More to the point, we have also made it clear that there is no right under the PDA to contact an attorney before a defendant decides whether to waive the right to counsel. <u>Id</u>. ¶ 23.

¶ 15. Defendant's remark to the interrogating officer here—"I want to do the right thing. But I don't know if the right thing is to get a—would they be able to come right now, so I could talk to you, lawyer?"—was not an unequivocal invocation of his right to counsel, and the officer had no obligation under federal law to stop questioning him. See <u>Davis</u>, 512 U.S. at 462; see also <u>People v. Adams</u>, 627 N.W.2d 623, 629-30 (Mich. Ct. App. 2001) (holding, under <u>Davis</u>'s objective standard, that suspect's statement—"Can I talk to him [a lawyer] right now?"—was

12

insufficient to invoke suspect's right to counsel and declining to suppress suspect's statement (alteration in original)).

¶ 16. The totality of the circumstances here included the following objective facts: defendant was not in handcuffs at the time of questioning; he repeatedly and insistently told the interrogating officer that he wanted to "tell [him] everything," even before the officer could give defendant his <u>Miranda</u> warnings; defendant verbally and in writing acknowledged that he understood the <u>Miranda</u> warnings; defendant was distressed and under great emotional pressure; the interrogating officer told defendant that "there are two sides to every story"; and the interrogating officer repeatedly told defendant that he was entitled to speak with an attorney before giving a statement to police and reminded defendant that he could "stop the questioning at any time."

¶ 17. Given those circumstances, we agree with the trial court's analysis. Defendant made an uncoerced choice to speak with the interrogating officer recognizing that "he just knew somebody was going to holler at him later for it probably," and his statement to the officer was not an unequivocal invocation of his right to counsel. See <u>Davis</u>, 512 U.S. at 462 ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."); <u>Moran</u>, 475 U.S. at 421 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.") Additionally, defendant demonstrated more than the requisite level of comprehension about the rights to which he was entitled and the consequences of waiving those rights. See <u>Moran</u>, 475 U.S. at 421 ("[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it . . . ."); <u>Robitaille</u>, 2011 VT 135, ¶ 28 (explaining that waiver analysis depends on "the particular facts and circumstances surrounding [each] case, including the background, experience, and conduct of the accused" (quotation omitted)). Defendant did not have an

13

independent right under the PDA to contact an attorney prior to deciding whether to waive his right to counsel, and our determination that he knowingly, intelligently, and voluntarily waived his right to speak to an attorney prior to giving a statement to police therefore resolves the issue under the PDA. Because the officer had no obligation to provide any answer to defendant's inquiry, the officer's statement that he could not advise him when a lawyer could get there was not an improper or misleading one. The trial court properly denied the motion to suppress.

## II. Expert Testimony Concerning Defendant's Sanity

¶ 18. One of the issues at trial was whether defendant had the necessary intent to commit murder. Defendant contended that due to his diminished capacity, he lacked the ability to form the necessary intent. Defendant did not pursue an insanity defense, but the State's expert, Dr. Cotton, testified about defendant's sanity. Defendant objected to that testimony at trial as irrelevant, and he raises that issue again before this Court, arguing that the testimony was unduly prejudicial because of the likelihood that it confused the jury.

¶ 19. On direct examination at trial, Dr. Cotton testified over defendant's objection "about his evaluation of [d]efendant's 'sanity at the time of the alleged offense.' " Specifically, Dr. Cotton testified "about his opinion that [d]efendant 'had the capacity to appreciate the criminality of his conduct,' " and that in his opinion, defendant " 'did have a capacity to conform his conduct to the requirements of the law.' " The court overruled defendant's objection to this line of testimony, reasoning that the testimony was relevant "because it informed the trier-of-fact about the context of his observations of [d]efendant and showed the basis for [his] opinions regarding [d]efendant's mental state at the time of the alleged offense." We disagree.

¶ 20. It is the duty of the State to prove the essential elements of the crime charged, including any necessary mental element. State v. Smith, 136 Vt. 520, 527-28, 396 A.2d 126, 130 (1978). Diminished capacity and insanity are related concepts pertaining to the defendant's state of mind at the time of the offense. Id. at 527, 396 A.2d at 130. Insanity is an affirmative defense;

14

when a defendant claims that he or she was insane at the time of the offense, the burden is on the defendant to establish insanity by a preponderance of the evidence. 13 V.S.A. § 4801(b). When the Legislature shifted the burden to the defendant to establish insanity, it evidenced an intent that sanity not be an essential element of the crime. State v. Messier, 145 Vt. 622, 627, 497 A.2d 740, 742 (1995). The same is not true of a defense based upon diminished capacity, which is an attempt to defeat the State's obligation to show the necessary intent to commit the crime. State v. Congress, 2014 VT 129, ¶ 29, 198 Vt. 241, 114 A.3d 1128. A successful insanity defense absolves the defendant from criminal responsibility for the death; a successful defense of diminished capacity in the homicide context renders the defendant guilty of, at most, involuntary manslaughter. Id. ¶ 30. Because intent is an essential element of a murder prosecution, the burden rests with the State to establish it. Id. ¶ 34.

¶ 21. Here, defendant did not assert that he was insane at the time of the offense. Rather, he claimed that mental stresses in his life made him incapable of forming the intent to kill required for murder. Thus, it remained the State's burden to prove that defendant had the necessary intent in order for him to be convicted of murder. See State v. Bruno, 2012 VT 79, ¶ 44, 192 Vt. 515, 60 A.3d 610. And although we afford the trial court broad latitude on the admission of evidence, State v. Brown, 147 Vt. 324, 328, 515 A.2d 1059, 1062 (1986), we disagree that Dr. Cotton's sanity references were admissible to provide context for his evaluation. Specifically, Dr. Cotton's testimony was irrelevant to whether defendant's intent met the required element of murder; the State was attempting to prove an issue that was not contested—defendant's sanity at the time of the offense—and Dr. Cotton's testimony did not have a tendency to prove any fact that was of consequence to the question of defendant's intent. See V.R.E. 401. The court should have excluded Dr. Cotton's testimony.

¶ 22. However, in its charge to the jury, the court provided the following instruction:

You have heard testimony from an expert regarding the legal definitions of mental disease or defect insanity. The law you should follow is the law that I have presented to you in these instructions by the Court. Any statements by the attorneys to the contrary are to be disregarded.

The legal definitions of mental disease or defect insanity and finding of mental disease or defect insanity are not for your consideration.

Defendant argues that Dr. Cotton's testimony concerning his sanity may have misled the jury to improperly disregard the diminished capacity evidence and that the court's decision to admit the testimony was not harmless error. Here, the court correctly and thoroughly instructed the jury that it is the State's burden to prove defendant's intent and that they should consider all of the surrounding facts and circumstances to determine defendant's state of mind.[2] The court further

---

[2] In addition to the admonition not to consider the definition or finding of insanity, the jury instruction on intent included the following:

As you consider Mr. Webster's mental state at the time of the killing you should consider all of the surrounding facts and circumstances and you must decide whether the [S]tate has proven that Mr. Webster acted with an intent to do great bodily harm.

A person acts intentionally if he or she acts purposely and not inadvertently because of mistake or by accident.

To find Mr. Webster acted intentionally you must find that it was his conscious objective to cause great bodily harm to Anna Marie Alger.

The term great bodily harm means bodily injury which involves a substantial risk of death, serious bodily injury or the long term loss or impairment of the function of any part of an organ of the body.

In determining Mr. Webster's state of mind you should consider all of the surrounding facts and circumstances established by the evidence. If you decide that at the time of the offense Mr. Webster was suffering from a mental condition which prevented him from forming this intent then he is not guilty of murder in the second degree. The cause of the mental condition is not relevant. You must consider all the evidence on this issue. If you have a reasonable doubt about whether Mr. Webster formed the required intent then you must give him the benefit of that doubt and find him not guilty

16

instructed the jury to disregard the legal definition of insanity and any consideration of insanity in its deliberations. The court's instruction in this regard was directed specifically at Dr. Cotton's testimony. There was no objection that the instruction given was inadequate or erroneous. We presume that jurors follow the law as set forth in the instructions given to them. State v. Dow, 2016 VT 91, ¶ 22, ___ Vt. ___, 152 A.3d 437. Where the jury was correctly charged on the State's burden to prove defendant's intent and what to consider in making that determination, and where the jury was given a specific instruction not to consider the irrelevant testimony concerning defendant's sanity, we conclude that any error in the admission of Dr. Cotton's testimony on defendant's sanity was effectively cured by the jury instruction.

### III. Prosecutor's Closing Argument

¶ 23. Defendant argues that the State committed misconduct in its closing argument in several instances. Defendant objected to one of the comments, but defendant raises challenges to the remaining comments for the first time on appeal. He also unsuccessfully moved for a new trial, based in part on the objected-to and unobjected-to comments made at closing. Three standards of review are therefore relevant. See Evans v. State, 177 So. 3d 1219, 1234 (Fla. 2015) (en banc) (per curiam) (reviewing three categories of argument under three standards of review in case involving improper closing argument where defense counsel objected to some but not all comments and where defense moved for new trial based on improper argument).

¶ 24. First, for the instances where the defense objected to improper comment and the trial court erroneously overruled defense counsel's objection, we apply a two-part harmless error test: was the closing argument improper and, if so, did it impair defendant's right to a fair trial?

---

of murder in the second degree. However, if you are convinced beyond a reasonable doubt that he could form the required intent and that he actually did so then this essential element has been met. In that case you need to consider whether the other essential elements of the offense have been proven.

See State v. Reynolds, 2014 VT 16, ¶¶ 28, 32, 196 Vt. 113, 95 A.3d 973.  In considering the second prong of that test, we have looked to these "nonexclusive" factors:

> the blatancy of the challenged statement, the impact on the theory of the defense, the persistence and frequency of the statement, the opportunity for the court to minimize potential prejudice, the strength of the evidence supporting the relevance of the statement, the overall strength of the State's case, the apparent motivation for making the remarks, and whether the statement was inflammatory and attacked defendant's character.

State v. Hemond, 2005 VT 12, ¶ 12, 178 Vt. 470, 868 A.2d 734 (mem.) (citations omitted).  In other words, "we weigh the statements in the context of the trial as a whole and not in isolation." Reynolds, 2014 VT 16, ¶ 28.  "Harmless error analysis requires the reviewing court to inquire if, absent the alleged error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." State v. Hamlin, 146 Vt. 97, 106, 499 A.2d 45, 52 (1985). The burden is on the State to show that the error was harmless. Chapman v. California, 386 U.S. 18, 24 (1967).

¶ 25.   Second, where counsel failed to raise a contemporaneous objection to improper closing argument, but challenges that argument on appeal, we apply a plain error standard.  See Hemond, 2005 VT 12, ¶ 14 ("We review for plain error where, as here, defendant did not object at trial to an allegedly improper statement by a prosecutor in the State's closing argument.").  Plain error exists in the context of a prosecutor's closing argument only if it impairs a defendant's right to a fair trial and "strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." Id. (quotation omitted).  Finally, where the trial court denied a motion for a new trial pursuant to Vermont Rule of Criminal Procedure 33, we review that ruling for an abuse of discretion. State v. Birchard, 2010 VT 57, ¶ 9, 188 Vt. 172, 5 A.3d 879.  We examine each challenged comment individually.[3]

---

[3]  Unlike many other states, Vermont has not adopted the cumulative error doctrine for reviewing the impact of numerous errors that alone would be harmless but that, when considered

¶ 26. We begin, however, by observing that claims of prosecutorial misconduct resulting from improper closing arguments have been made with frequency recently.[4] We have repeatedly cautioned prosecutors to keep their comments in closing arguments within permissible boundaries. Despite these admonitions, claims of improper closing arguments persist with alarming regularity. It should not be the goal of a prosecutor to probe the outer limits of propriety in a closing argument. See State v. Lapham, 135 Vt. 393, 406, 377 A.2d 249, 257 (1977) (describing prosecutor's "duty to refrain from improper methods calculated to produce a wrongful conviction and to guard against conduct unintentionally trespassing the bounds of propriety"). Rather, a closing argument is the State's opportunity to persuade the jury that it has met its burden of proof to establish the essential elements of the charges beyond a reasonable doubt. In short, prosecutors "must never forget their

_____

together, undermine the fairness of a trial. See, e.g., Evans, 177 So. 3d at 1238-39 (reversing conviction for cumulative error, taking into account objected-to and unobjected-to errors, and describing standard as to whether combined effect of errors undermined fairness of trial such that state could not prove that there was "no reasonable possibility that the error contributed to conviction" (quotation omitted)); State v. Hart, 301 P.3d 1279, 1292 (Kan. 2013) (declining to reverse conviction for cumulative error and describing standard as "whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial"); Valdez v. State, 196 P.3d 465, 480-81 (Nev. 2008) (reversing conviction for cumulative error where there was significant evidence of guilt and explaining that "[t]his court must ensure that harmless-error analysis does not allow prosecutors to engage in misconduct by overlooking cumulative error in cases with substantial evidence of guilt"); State v. Dunn, 850 P.2d 1201, 1229 (Utah 1993) ("Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." (alterations and quotation omitted)); Hamilton v. State, 396 P.3d 1009, 1015-16 (Wyo. 2017) ("Cumulative error occurs when two or more individually harmless errors have the potential to prejudice the defendant to the same extent as a single reversible error. . . . We reverse a conviction only when the accumulated effect of the errors constitutes prejudice and the conduct of the trial is other than fair and impartial." (quotations, alteration, and citations omitted)). Neither party in this case argued for a cumulative error approach and we therefore decline to address the issue, other than to acknowledge that under any standard of review, the comments in this case were not sufficiently prejudicial to warrant reversal.

[4] See, e.g., State v. Ladue, 2017 VT 20, ___ Vt. ___, ___ A.3d ___; State v. Atherton, 2016 VT 25, ___ Vt. ___, 144 A.3d 311; State v. Madigan, 2015 VT 59, 199 Vt. 211, 122 A.3d 517; State v. Groce, 2014 VT 122, 198 Vt. 74, 111 A.3d 1273; State v. Spaulding, 2014 VT 91, 197 Vt. 378, 103 A.3d 487; State v. Reynolds, 2014 VT 16; State v. Fellows, 2013 VT 45, 194 Vt. 77, 76 A.3d 608; State v. Brandt, 2012 VT 73, 192 Vt. 277, 50 A.3d 141.

fundamental obligation is not to convict but to see that justice is done. If fairness and justice are forgotten in the pursuit of a guilty verdict, the integrity and authority of our criminal justice system is challenged." State v. Goode, 650 A.2d 393, 397 (N.J. Super. Ct. App. Div. 1994) (citations omitted).[5] A prosecutor's comments should not to be inflammatory, should be confined to the evidence and the reasonable inferences drawn from them, and should not inject the prosecutor's personal opinion as to a defendant's guilt. Lapham, 135 Vt. at 407, 377 A.2d at 257. These tenets are neither new nor abstruse. They must be followed, and if they are not, reversal is warranted in appropriate cases. Id. In an appropriate case, improper remarks in closing argument may provide a basis for professional conduct review.

### A. Objected-To Comment

¶ 27. In closing argument, defendant's counsel stated: "This is a case of manslaughter versus murder. This is a case of mitigation. This is a case of unlawful killing, but not murder. This is a case of manslaughter." In response, the prosecutor, after discussing the necessary intent for murder, stated in rebuttal closing: "I don't want to, you know, drag the red herring across the trail and have you go down there because, just because the defense started out there, but I'll talk to you about manslaughter because he did." Defense counsel objected to this remark, claiming it was an improper labeling of the defense as a smoke screen or red herring. See State v. Francis, 151 Vt. 296, 300, 561 A.2d 392, 394 (1989) ("Labeling the defense summation as a 'smoke screen' mischaracterized what we find to be reasonable and relevant arguments."); State v. Brown, 153 Vt. 263, 274-75, 571 A.2d 643, 649-50 (1989) (agreeing that labeling defense as red herring warranted curative instruction). The court sustained the objection and instructed the jurors "to

---

[5] Similarly, in the discovery context, we have observed that prosecutors have a duty "beyond that of an adversary" because they are "the conscience, not of an ordinary party to a dispute, but of a sovereign whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." State v. Gibbons, 146 Vt. 342, 344, 503 A.2d 540, 541 (1985) (per curiam) (quotation omitted).

20

disregard [the prosecutor's] last statement," without specifically directing the jurors to the red herring comment. No objection was made to the adequacy of the court's curative instruction.

¶ 28. The "red herring" comment was framed in the context of something the prosecutor did not want to raise, and his transparent attempt to disguise the remark made it no less objectionable. The comment was an apparent attempt to disparage defendant's argument that he was guilty only of manslaughter. Despite its objectionable nature, the comment was an isolated one. Moreover, it was a comment about an issue on which both sides had presented expert testimony and had discussed in their closing arguments in some detail: whether defendant had the requisite intent to comment murder. The topic of the comment, the presence or absence of an intent to kill, was an appropriate one and a central issue in the case; the characterization of the defense as a "red herring" in the eyes of the prosecutor was what was improper. Improper remarks in closing argument can in many cases be corrected by curative instructions. State v. Percy, 146 Vt. 475, 479, 507 A.2d 955, 957 (1986). "[A] strongly worded and prompt admonition is preferred," State v. Normandy, 143 Vt. 383, 386, 465 A.2d 1358, 1360 (1983); however, "[t]he circumstances of each case must govern its merits." State v. Foy, 144 Vt. 109, 116, 475 A.2d 219, 224 (1984). "The final inquiry is whether the defendant's rights were so injuriously affected as to deprive him of a fair trial." Id. The prompt admonition to disregard the prosecutor's "last statement" was given here and no further request for and additional curative instruction was made. In the context of the trial as a whole, including the substantial evidence and argument about defendant's intent or lack thereof, we cannot say that this isolated comment impaired defendant's right to a fair trial. See Reynolds, 2014 VT 16, ¶¶ 28, 32.

## B. Unobjected-To Errors

¶ 29. Defendant also challenges three aspects of the prosecutor's closing argument to which he did not object at trial. First, defendant alleges that the prosecutor mischaracterized the

21

defense as attempting to claim the victim was responsible for her own death. During closing argument, the prosecutor said:

> I mean why are we talking about that, right? Because Anna was loud and Anna was outspoken, and Anna was saying what kind of piece of shit do you think you are? And Anna was pointing her finger at him. Why are we talking about that? Because that means Anna deserved to get shot? That means Anna had it coming? That she bought into this, that she's responsible for it? Anna could have just driven around because he pulled way over to the side of the road. So instead she stops to yell at this guy who just cut her off. So it should be okay for him to shoot her? No. None of this was Anna Alger's fault.

¶ 30. While defendant claims this comment was an improper attempt to characterize defendant's argument, in his closing argument, defendant's counsel pointed out testimony from a witness that there was room for Alger's vehicle to get past defendant's vehicle without stopping and there was no reason for her not to pass him. The prosecution interpreted the defense argument, based upon evidence from the witness, coupled with the claim that defendant was provoked, to be raising the issue of the propriety of Alger's decision to stop and approach defendant in an angry fashion, thus calling her judgment into question. Another possible interpretation is that the evidence and defense counsel's comment upon it were directed at the impact Alger's decision to pull over may have had on defendant's state of mind. A prosecutor is entitled to make fair comment on the evidence. State v. Brandt, 2012 VT 73 ¶ 29. Both interpretations in the context of the trial are reasonable ones and, in light of this, the prosecutor's responsive comments were not improper.

¶ 31. Defendant also claims that the prosecutor improperly suggested defendant's expert was less than forthcoming in his expert opinions concerning defendant's lack of intent. The prosecutor told the jury that defendant's expert was "hiding the ball" and allegedly made a gesture to signify money by rubbing his fingers together. The defendant's expert, Dr. Holt, did not write a report concerning his opinions, and the prosecution contended that his opinions at trial exceeded

22

those he disclosed in his deposition. Dr. Holt was cross examined on both points by the prosecution in an attempt to establish bias on the part of the expert. He admitted that he had reached an opinion with more specificity since his deposition had been taken. This background provided the context for the prosecution's claim in closing argument that Dr. Holt was "hiding the ball." Under the circumstances of this case, the prosecutor's statement was a fair comment on the evidence.

¶ 32.    During closing argument, the prosecutor rubbed his fingers together, in what defendant contends was a "money gesture," when the prosecutor was discussing the absence of a written report by Dr. Holt. No objection was made to the gesture at the time. Defendant first raised the issue in his motion for a new trial. The trial court found the gesture to be equivocal in nature. Defendant does not contend the court's finding that the gesture was equivocal to be erroneous. Accordingly, we cannot discern any basis for error on this record concerning the gesture made by the prosecutor.

¶ 33.    Lastly, in discussing the absence of the need to prove motive, the prosecutor said:

> The only thing the law will require us to prove and for you to find is that he intended to do her great bodily harm. Going back to that hammer and nail for a minute this is a fellow who looked at the whole world like a hammer, carrying these two guns around all the time. If you look at the world like a hammer what does the rest of the world look like? It looks like a nail. You're going to find a reason, an excuse to act out in that way.

Defendant claims this comment was a both a violation of the "golden rule" prohibition and an improper comment on defendant's violent propensity. A "golden rule" violation is an improper appeal to the sympathy of jurors by asking them to place themselves in the shoes of the victim. State v. Scales, 2017 VT 6, ¶ 28, ___ Vt. ___, 164 A.3d 652. This did not occur here. More to the point is defendant's argument that this comment suggested that defendant had a dangerous propensity because he viewed himself as a hammer, carrying around two guns all the time, and the world as a nail, and that he would find an excuse to act out in that way. The comment impugned

23

defendant's character and was improper. The general rule is that character evidence is not admissible to prove a defendant "acted in conformity therewith on a particular occasion." Percy, 158 Vt. at 415, 612 A.2d at 1123; V.R.E. 404(a). However, this comment was isolated and the reference indirect. The jury was instructed that the attorneys' comments were not evidence in the case and that their verdict should be based solely on the evidence. While the prosecutor's closing argument in this respect was outside the bounds of proper argument, we cannot say that the closing argument was "manifestly and egregiously improper." See State v. Ayers, 148 Vt. 421, 426, 535 A.2d 330, 333 (1987) (noting that reversible error is present only when an argument is "manifestly and egregiously improper" (quotation omitted)). Defendant's right to a fair trial was not impaired as a result of the improper propensity aspects of the State's closing argument. We conclude there was no plain error.

## C. Motion for a New Trial

¶ 34. Defendant raised all of these alleged errors—both the objected-to and unobjected-to errors—in a motion for a new trial. Vermont Rule of Criminal Procedure 33 governs the trial court's decision whether to grant a motion for a new trial, and we review that ruling for an abuse of discretion. Birchard, 2010 VT 57, ¶ 9 (quoting V.R.Cr.P. 33). Here, the trial court engaged in a reasoned and thorough review of defendant's claims of error and held that although the State engaged in improper argument, the comments did not deprive defendant of his right to a fair trial "due to the overwhelming evidence that [d]efendant killed Anna Alger with the mental state necessary for the jury to convict [d]efendant of second-degree murder." The court applied the proper legal standard and did not abuse its discretion in reaching that conclusion.

## IV. Decision not to Include Voluntary Manslaughter Charge

¶ 35. Defendant claims that the court committed error by failing to charge voluntary manslaughter due to provocation by the victim. As part of that argument, defendant asserts that the State should have been required to disprove provocation on the part of the victim.

24

¶ 36.    At trial, defendant did not deny that he was the person who fired the shots, nor claimed that the shooting was done in self-defense; rather, defendant presented two theories of the crime that were, in some respects, inconsistent with each other.  First, he asked the jury to find that, as a result of his diminished mental capacity at the time of the shooting, he lacked the intent to commit murder and he was therefore guilty only of involuntary manslaughter.  Second, defendant argued that he was provoked and that he was therefore not guilty of second-degree murder or any of its lesser-included offenses, but instead guilty of voluntary manslaughter.  The court instructed the jury on second-degree murder and involuntary manslaughter, not on voluntary manslaughter, and the jury convicted defendant of second-degree murder, meaning it found that he acted, at a minimum, "with an <u>intent</u> to do <u>great bodily harm</u>."

¶ 37.    The elements of voluntary manslaughter and second-degree murder are the same— (1) a defendant (2) caused the death of another person (3) that was unlawful and (4) did so with an intent to kill, an intent to do great bodily harm, or a wanton disregard of the likelihood that death or great bodily harm would result—and "[t]he critical factor" that distinguishes the crimes from each other is "the existence of mitigating circumstances" in a voluntary manslaughter case.  <u>State v. Blish</u>, 172 Vt. 265, 272, 776 A.2d 380, 386 (2001).  Compare Vt. Criminal Jury Instruction Comm'n, Second Degree Murder, Vt. Jury Instructions, http://www.vtjuryinstructions.org/ criminal/MS24-101.htm [https://perma.cc/7FXR-QBKQ] (listing elements of second-degree murder), with Vt. Criminal Jury Instruction Comm'n, Voluntary Manslaughter, Vt. Jury Instructions, http://www.vtjuryinstructions.org/criminal/MS24-201.htm [https://perma.cc/NZW9-2MNA] (listing identical elements but explaining that "[s]udden passion or great provocation can reduce a charge of murder to a charge of voluntary manslaughter").  Thus, "[i]f the State fails to meet its burden to prove the requisite intent for second-degree murder, then it has necessarily failed to prove the requisite intent for voluntary manslaughter."  <u>Congress</u>, 2014 VT 129, ¶ 34. Involuntary manslaughter, on the other hand, is a lesser-included offense of second-degree murder

in which the State has insufficient evidence to establish the state-of-mind element for murder. Id. ¶ 33.

¶ 38. Here, defendant's legal theory in response to the second-degree murder charge was that, due to his diminished capacity, he was incapable of forming the intent necessary to satisfy a charge of second-degree murder. Defendant effectively contested only the intent element of the second-degree murder charge. Thus, he attempted to persuade the jury in closing argument that he was guilty of involuntary manslaughter, not murder, by admitting that he shot Alger while committing an illegal act, but that he had no intention to kill her. This legal theory was unsuccessful.

¶ 39. At the same time, he urged the trial court to charge the jury on voluntary manslaughter, which is murder that would otherwise be second-degree, but is committed under circumstances where sudden passion or provocation mitigates, but does not excuse, the killing. See id. ¶ 30. The sudden passion or provocation necessary to mitigate a second-degree murder charge to voluntary manslaughter is that which would cause a reasonable person to lose self-control. State v. Johnson, 158 Vt. 508, 518, 615 A.2d 132, 137-38 (1992). We must therefore decide whether the court erred in declining to include an instruction on voluntary manslaughter. See State v. Parker, 139 Vt. 179, 183, 423 A.2d 851, 853 (1980) (finding no plain error where defendant, on appeal, argued that court erred by not including instruction for inconsistent lesser-included offense).

¶ 40. Before a defendant is entitled to an instruction on a theory of defense, the defendant must establish a prima facie case on each of the elements of that legal theory. State v. Knapp, 147 Vt. 56, 59, 509 A.2d 1010, 1011 (1986). Defendant is correct that, in the voluntary manslaughter context, once sudden passion or provocation is implicated, it becomes the prosecution's burden to disprove sudden passion or provocation beyond a reasonable doubt. State v. Hatcher, 167 Vt. 338, 345-46, 706 A.2d 429, 433. Defendant made no claim that he acted out of sudden passion

26

concerning this killing. Thus, only if provocation was fairly raised was defendant entitled to a jury charge on voluntary manslaughter and the prosecution obligated to establish its absence beyond a reasonable doubt.

¶ 41. "For defendant to be entitled to an instruction on voluntary manslaughter, the facts must have showed (1) adequate provocation; (2) inadequate time to regain self-control or 'cool off'; (3) actual provocation; and (4) actual failure to 'cool off.' " State v. Kulzer, 2009 VT 79, ¶ 25, 186 Vt. 264, 979 A.2d 1031. As we recognized in State v. Bolaski, we have never specifically defined provocation. 2014 VT 36, ¶ 27, 196 Vt. 277, 95 A.3d 460. However, definitions from other jurisdictions typically describe an action of provocation in terms of the reaction it is expected to induce. See, e.g., Varner v. Stovall, 500 F.3d 491, 500 (6th Cir. 2007) (defining provocation under Michigan law to be action that causes "defendant to act out of passion rather than reason" and that would cause "reasonable person to lose control" (quotation omitted)); People v. Fenenbock, 54 Cal. Rptr. 2d 608, 617 (Ct. App. 1996) ("[P]rovocation may be anything which arouses great fear, anger or jealousy."); State v. Melendez, 643 P.2d 607, 608 (N.M. 1982) ("[P]rovocation can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions." (quotation omitted)).

¶ 42. To constitute adequate provocation, the degree of provocation must be such that "would cause a reasonable person to lose self-control and act without thinking." State v. Herrick, 2011 VT 94, ¶ 19, 190 Vt. 292, 30 A.3d 1285. The loss of self-control must be objectively reasonable under the circumstances. State v. Turgeon, 165 Vt. 28, 32-33, 676 A.2d 339, 342 (1996), overruled on other grounds by State v. Brillon, 2008 VT 35, 183 Vt. 475, 955 A.2d 1108, overruled by Vermont v. Brillon, 566 U.S. 81 (2009). Thus, a heated exchange with one person provides no adequate provocation for a reaction directed at another. For example, in State v. Turgeon, the defendant argued that fighting with his wife was provocation for shooting a police officer who was trying to arrest him. 165 Vt. at 33, 676 A.2d at 342. In rejecting that claim, we

27

held that shooting a third person who was not involved in the initial altercation was not reasonable under any view of the facts. Only provocation by the victim is considered in determining whether adequate provocation exists. Id.; see also Kulzer, 2009 VT 79, ¶ 26.

¶ 43. Here, there was considerable evidence of defendant's angst over his predicament in being involved in an angry exchange with his wife during and shortly after having a conversation with his girlfriend. The situation he found himself in regarding his wife and his girlfriend plays no part, however, in whether defendant was adequately provoked by Alger. The evidence established that the shooting occurred when Alger pulled her car in behind defendant's vehicle, got out, and began walking toward defendant, who had also gotten out of his car. At that time, Alger was yelling at him and waving or pointing her arms. She had previously raised her middle finger at him. As she came toward him, she yelled words to the effect of, "What kind of a piece of shit do you think you are?" There was no suggestion she had any weapon; her actions were merely words and gestures. The gestures themselves were not described as threatening. Words and gestures are insufficient to constitute adequate provocation. See Barron v. State, 777 S.E.2d 435, 438 (Ga. 2015) (contemptuous gestures not enough to downgrade to voluntary manslaughter); State v. Gooding, 335 P.3d 698, 704 (Kan. Ct. App. 2014) (insulting words or gestures not enough to downgrade killing to voluntary manslaughter). Under no view of the facts in this case can we say that Alger's actions would cause a reasonable person to lose self-control and to respond in a fit of anger without thinking. No reasonable juror could find that Alger's yelling and her waving or pointing upon her approach to defendant was such that a reasonable person would lose self-control and shoot Alger multiple times. Because no reasonable jury could find adequate provocation, the court was not required to instruct this jury on a charge of voluntary manslaughter. Passion or provocation were not fairly raised by the evidence, and defendant was not entitled to a charge on those issues or to have the jury instructed on voluntary manslaughter.

## V. Sentencing Decision

¶ 44. Defendant claims the court abused its discretion by imposing a sentence of forty years to life on the second-degree murder charge. In particular, defendant claims the reasons supporting the court's sentencing decision are present in every second-degree murder conviction, and the fact that the sentence is unusually long for a second-degree murder conviction is evidence that the court abused its discretion.

¶ 45. The "trial court has broad discretion in fashioning a sentence." State v. Putnam, 2015 VT 113, ¶ 28, 200 Vt. 257, 130 A.3d 836. Accordingly, our review on appeal is for an abuse of discretion. State v. Campbell, 2015 VT 50, ¶ 9, 199 Vt. 78, 120 A.3d 1148. If a sentence falls within the statutory limits, is not based upon improper or inaccurate information, and is not the result of personal animus or bias, it will be affirmed. State v. Ingerson, 2004 VT 36, ¶ 10, 176 Vt. 428, 852 A.2d 567. A sentencing court is not confined only to the facts and circumstances of a case in fashioning an appropriate sentence and it may consider factors, such as a prior conviction. State v. Morrill, 129 Vt. 460, 464, 282 A.2d 811, 814 (1971). In addition, the court must consider "the history and character of the defendant, the need for treatment, and the risk [the defendant poses to] others and the community at large." 13 V.S.A. § 7030(a).

¶ 46. Here, the court considered the nature and circumstances of the crime, and at the sentencing hearing, described them as "a frightening and sudden and devastating set of circumstances." The court acknowledged that defendant had no prior record of significance, presented a low to moderate risk to reoffend, and likely still required treatment for mental and physical ailments. The court found it likely that suicidality was the greatest precipitating factor in what occurred. Focusing on common law sentencing factors, the court emphasized the need for deterrence, citing the community's interest in general deterrence, retribution, incapacitation, and punishment. Finding that defendant's actions lacked any provocation, were deliberate, and were the result of a conscious decision on his part, and that defendant was entirely responsible for the

outcome of those actions, the court imposed a forty-year minimum sentence on the second-degree murder conviction with a maximum of life. The court made the murder sentence consecutive to two consecutive sentences of eleven months to one year for defendant's misdemeanor convictions.

¶ 47. Although the sentence was significant, there is no suggestion that it was motivated by any bias or improper motive by the sentencing judge. On the contrary, the record reflects proper consideration of the sentencing factors. The judge placed heavy emphasis on the nature of the crime, a shooting occurring as the result of traffic incident, and the finding that defendant's response was entirely controlled by his decision to direct his rage at an innocent person and to shoot her. In addition, the judge placed considerable emphasis on the need for general deterrence in this instance.

¶ 48. Defendant has not shown any abuse of discretion here. He has not shown that the trial judge relied on improper information in imposing the sentence, or that the sentence was the result of any bias on the part of the sentencing judge. That a different judge may have imposed a different sentence or weighed the sentencing factors differently is not the test. Even if defendant's contention that the factors relied on by the sentencing judge here would be present in every murder case, this would not amount to sentencing error. The court acted within its discretion in imposing the forty years to life sentence on the second-degree murder charge.

Affirmed.

FOR THE COURT:

_____

Associate Justice

30