2014 VT 16

# State of Vermont v. Stanley Reynolds

[95 A.3d 973]

No. 12-239

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**

Opinion Filed February 14, 2014

Motion for Reargument Denied March 12, 2014

*Christopher C. Moll*, Lamoille County Deputy State's Attorney, Hyde Park, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Crawford, J.** Defendant appeals from his conviction of sexual assault. He contends that the case should have been

dismissed on speedy trial grounds and that he is entitled to a new trial based on statements made in closing argument by the prosecution. We affirm.

¶ 2. Defendant was charged on March 3, 2010 with a single count of sexual assault without consent and released on bail. He was initially defended by Attorney Richard Goldsborough. Preparation and trial of the case were complicated because two of the State's witnesses, including the complaining witness, are deaf and required the assistance of American Sign Language (ASL) interpreters. Trial was originally scheduled for January 2011 and continued to March 8, 2011. The case then commenced as scheduled, but after jury selection and two days of trial, the court declared a mistrial on March 10, 2011. The mistrial was requested by both sides due to significant problems with the sign-language interpretation process.

¶ 3. On July 1, 2011, the court scheduled a status conference for August 1. At the conference, the court set the case for a retrial to commence October 17, 2011. The case was scheduled as the first on the list for jury selection, with trial to follow immediately afterward. On August 1, Attorney Goldsborough moved to withdraw on the ground that defendant had spent all his available money on legal fees and could no longer afford private counsel. At the same time, Attorney Goldsborough filed a motion to dismiss the case on speedy trial grounds. On August 8, the court permitted Attorney Goldsborough to withdraw and assigned Attorney Daniel Maguire to represent defendant at the State's expense.

¶ 4. The court issued an entry order on September 2 setting the motion to dismiss for a hearing. The order included the following language:

> Given complexity of case, [the] need for prior ruling on pending motions, and substitute counsel's recent appearance; given substantial lead time needed to arrange for interpreters, the October 17, 2011 jury draw/trial for this action is continued.

On September 14, the court held a second status conference at which it rescheduled the trial for December 12.

¶ 5. On November 3, 2011, the court issued a detailed entry order concerning the scheduling of the case. The court recounted the history of prior trial dates, the mistrial, the appointment of

Attorney Maguire, and Attorney Maguire's commitment to try a serious felony case in Washington Criminal Division in December 2011. That case was older than defendant's case and involved a defendant who was held for lack of bail. The court also recognized the "special issues" presented by the need for highly qualified ASL interpreters available only with substantial advance notice. The court acknowledged the problem of delay:

> The court is, of course, mindful that Defendant has already filed a motion to dismiss this action and this charge against him, on the grounds that his speedy trial rights have already been irreparably compromised. Further delay will, of course, only complicate the resolution of those claims. That motion remains pending, and has not yet been decided by the court. Nonetheless, for the reasons stated, and despite the lack of any formal motion for continuance of this case filed by the Defendant, this court will cancel the jury draw and trial in this matter now set for December 12, 2011.

The court rescheduled the trial for February 13-16, 2012. Trial commenced as scheduled on February 13 and concluded with a guilty verdict on February 17, 2012. Defendant was sentenced to serve five years to life and is currently incarcerated.

¶ 6. On appeal, defendant argues that the two-year delay between arraignment and the second trial violated his speedy trial rights under the United States and Vermont Constitutions. He further claims that the conviction must be reversed due to prejudicial statements made by the prosecutor in his closing argument.

## I. Speedy Trial Claims

¶ 7. ▮ The Sixth Amendment guarantee of a "speedy and public trial" was extended to state prosecutions through the Due Process Clause of the Fourteenth Amendment in 1967. *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). In *Barker v. Wingo*, the U.S. Supreme Court gave modern shape and content to the guarantee. 407 U.S. 514 (1972). The Court noted that the right to a speedy trial differs from other constitutional rights in several respects. There is no intermediate remedy for a violation of the speedy trial right such as the exclusionary rule or a new trial. *Id.* at 522. The only possible remedy is dismissal of the charge. *Id.*

Additionally, "there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Id.* at 519. Other constitutional rights, such as the guarantee of defense counsel, primarily benefit the criminal defendant. The promise of a "speedy and public trial," however, is of concern to all parties. *Id.* at 519-22.

¶ 8. ■ The *Barker* decision identifies four factors to be balanced by courts in determining whether too much time has elapsed between arraignment and trial. *Id.* at 530. These are the length of the delay, the reason for the delay, the extent to which defendant asserted his speedy trial right, and any prejudice to the defendant caused by the delay. *Id.* The *Barker* decision rejected a system of fixed deadlines in favor of a discretionary standard which requires the courts to balance these factors. *Id.* at 529-30.

¶ 9. Because the trial court must make both factual and legal decisions in considering the *Barker* factors, we apply a mixed standard of review. *State v. Brillon,* 2008 VT 35, ¶ 14, 183 Vt. 475, 955 A.2d 1108, *rev'd on other grounds by Vermont v. Brillon,* 556 U.S. 81 (2009). We will not disturb the trial court's factual findings concerning the reasons for delay or the showing of prejudice unless they are clearly erroneous. *State v. Turner,* 2013 VT 26, ¶ 6, 193 Vt. 474, 70 A.3d 1027. However, we review the ultimate legal conclusion about whether the pretrial delay resulted in a constitutional violation on a de novo basis. *Id.*

¶ 10. Three preliminary issues need to be addressed. The first is whether we should consider the merits of the *Barker* speedy trial analysis in the absence of an articulated ruling from the trial court on the motion to dismiss. Defendant correctly points out that the trial judge never issued a ruling, written or oral, concerning the motion to dismiss on speedy trial grounds. Instead, the court scheduled the second trial, effectively denying the motion without explanation. Defendant argues that we should remand the case for a fuller description of the factors which the trial court considered and applied in exercising its discretion to schedule the case for trial some two years after arraignment. The second trial took place more than a year ago. A remand would likely result in a review of the cold record by the trial judge that is essentially identical to the review now required of the appellate court. In an appeal in which delay is the central claim, it is hardly desirable to return the case for further proceedings below unless

absolutely necessary. We hold that a remand is not necessary in this case, because the docket entries and transcripts of the pretrial conferences provide a sufficient basis to review the trial court's decision to proceed with the second trial.

¶ 11. The second preliminary issue is whether the trial court abused its discretion by failing to dismiss the case for noncompliance with the timelines set forth in Administrative Order 5. Section 3 of the order provides that all criminal cases shall be trial-ready within six months of the date of arrest. Cases that go unresolved beyond the deadline without good cause may be dismissed by the trial court. A.O. 5, § 3. In addition, the order provides that cases in which defendants are in custody "shall proceed to trial within 90 days from the date of arraignment." *Id.* § 2.

¶ 12. ■ Administrative Order 5 has never been held to bind the trial courts to its time frames. The order is part of the internal operating procedures of the trial courts and does not provide any rights to defendants. *State v. Snide*, 144 Vt. 436, 441, 479 A.2d 139, 142-43 (1984) ("[Administrative Order 5] cannot be invoked by a defendant as a matter of right, and a speedy trial violation is not predetermined by its operation." (citations omitted)). "Exercise of the order is entirely discretionary, and it is for the trial court to determine, in each case, whether dismissal shall result." *Id.* at 441, 479 A.2d at 143.

¶ 13. ■ The trial court did not abuse its discretion by failing to dismiss this case for noncompliance with the order. The order, which was promulgated in 1972, has proved to set impossibly short deadlines for the pretrial preparation of serious felony cases, which may take a year or longer to reach trial. See, e.g., *Turner*, 2013 VT 26, ¶ 8 (involving eighteen-month delay between arraignment and trial in prosecution for lewd and lascivious conduct); *State v. Menize*, No. 2011-287, 2012 WL 5974994, at *2 (Vt. Sept. 26, 2012) (unpub. mem.), https://www.vermontjudiciary.org/LC/unpublishedeo.aspx (involving fifteen-month delay between arraignment and trial in aggravated sexual assault case). There are numerous legitimate reasons for the extended timeframes in these cases, including the need for discovery and the identification of witnesses, primarily but not exclusively by the defense; scientific testing and expert testimony of a sophistication not contemplated in 1972; and the practice of conducting depositions of the State's

witnesses prior to trial. A rush to judgment is no more desirable than a period of unnecessary delay. Other less-desirable reasons for delay include crowded court schedules and conflicting commitments by the relatively small group of lawyers available to defend serious felony cases.

¶ 14. ■ Administrative Order 5 is the only Supreme Court directive purporting to set timelines for the trial of cases. Since its promulgation, however, Vermont courts have implemented case flow management standards intended to reduce or eliminate delay in all proceedings. The time has come to acknowledge that the six-month and three-month deadlines set out in Administrative Order 5 no longer reflect the length of time required to bring a serious felony case to trial in our state or the prudent approach to timely processing of criminal cases. We will refer the issue of nonbinding time frames for the resolution of criminal charges and the possible revision or repeal of Administrative Order 5 to the Criminal Rules Committee.

¶ 15. The third preliminary issue is whether the case is subject to a more stringent standard for delay under the speedy trial provisions of the Vermont Constitution.[1] We note that concerns about the time taken to reach trial have been a source of criticism and a basis for legal reform for as long as there have been courts.[2] Vermont was not alone in including promises of a speedy trial in its early constitutional statements. See, e.g., N.H. Const. pt. 1, art. 14 (1784); Mass. Const. pt. 1, art. 11 (1780). Because the

---

[1] See Vt. Const. ch. I, art. 4 ("[E]very person ought to obtain right and justice, freely, and without being obliged to purchase it; completely and without any denial; promptly and without delay; conformably to the laws."); ch. I, art. 10 ("That in all prosecutions for criminal offenses, a person hath a right to . . . a speedy public trial by an impartial jury of the country . . . ."); ch. II, § 28 ("The Courts of Justice shall be open for the trial of all causes proper for their cognizance; and justice shall be therein impartially administered, without corruption or unnecessary delay.").

[2] Early examples include the Code of Hammurabi, ¶ 12 (L.W. King trans.) (1772 B.C.E.) ("If the witnesses be not at hand, then shall the judge set a limit, at the expiration of six months. If his witnesses have not appeared within the six months, he is an evil-doer, and shall bear the fine of the pending case."); the Magna Carta, ¶ 40 (1215) ("To no one will we sell, to no one will we refuse or delay, right or justice."); and the Frame of Government of Pennsylvania, Laws Agreed Upon in England § V (1682) ("That all courts shall be open, and justice shall neither be sold, denied nor delayed."). All of the above are available at http://avalon.law.yale.edu/ancient/hamframe.asp.

Sixth Amendment had no possible application to state criminal prosecutions until after the Fourteenth Amendment was enacted, see *Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 250-51 (1833) (holding that the Bill of Rights applies only to federal government and not to states), it is unsurprising that parallel guarantees developed in state and federal constitutions.

¶ 16. So long as the speedy trial guarantee is viewed as equal or coterminous under the U.S. and Vermont Constitutions, there is no need to assert the primacy of one guarantee over the other. On some issues, the Vermont provision may provide a different degree of protection against court delay than the Sixth Amendment. See *State v. Savva*, 159 Vt. 75, 84, 616 A.2d 774, 779 (1991) ("We have often noted that our constitution may afford greater protection of individual rights than the federal one does."). In other areas, the two Constitutions may provide similar protection of individual rights.

¶ 17. The evidence, either historical or textual, that "speedy" means faster in Vermont than it does in other states and in the federal courts is thin. In more than two centuries since the adoption of the first Vermont Constitution in 1777, the Vermont Supreme Court has never discerned a more stringent standard than the Sixth Amendment. See *State v. Brillon*, 2010 VT 25, ¶ 5, 187 Vt. 444, 995 A.2d 557 (declining to adopt different standard under Vermont Constitution because issue was inadequately briefed); *State v. Venman*, 151 Vt. 561, 574-76, 564 A.2d 574, 583 (1989) (applying *Barker* test to speedy trial claim made under both U.S. and Vermont Constitutions); *State v. Hall*, 145 Vt. 299, 308, 487 A.2d 166, 171 (1984) (holding that Vermont Constitution does not provide greater protection against appellate delay than U.S. Constitution); *State v. Mahoney*, 124 Vt. 488, 490-91, 207 A.2d 143, 145 (1965) (using same standard to analyze claim made under both constitutions). The pertinent language of Article 10, which has traditionally been considered to be the operative speedy trial provision of our constitution, see, e.g., *Mahoney*, 124 Vt. at 490, 207 A.2d at 145, is nearly identical to that of the Sixth Amendment. Compare Vt. Const. ch. I, art. 10 ("That in all prosecutions for criminal offenses, a person hath a right to . . . a speedy public trial . . . ."), with U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). Further, the provisions guaranteeing justice "promptly and without delay," in Chapter I, Article

4, and "without . . . unnecessary delay," in Chapter II, § 28, have the same general meaning as a "speedy and public trial."

¶ 18. ■ The principal difficulty in accepting the argument that the Vermont Constitution sets a higher standard is that it is difficult to articulate a formula that improves upon *Barker*. The strength and utility of the *Barker* standard lies in its flexibility and lack of fixed deadlines. The speedy trial guarantee would certainly operate with greater predictability if it imposed fixed timelines for the operation of the trial courts. However, as the *Barker* decision notes, this is a remedy open to the legislature but not one normally derived from constitutional principles. *Barker*, 407 U.S. at 523. At present, the *Barker* factors and the case law that has been developed under the Sixth Amendment continue to provide an appropriate standard by which to measure the timeliness of trials under both the U.S. and Vermont Constitutions.

¶ 19. ■ We turn now to the application of the *Barker* factors to this case. Our first task is to determine whether the length of the delay was presumptively prejudicial. See *Barker*, 407 U.S. at 530 ("Unless there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). In this case, twenty-three months elapsed between defendant's arraignment and the second trial. This delay is long enough to trigger evaluation of the remaining factors. See *Turner*, 2013 VT 26, ¶ 8 (eighteen-month delay is presumptively prejudicial); *State v. Vargas*, 2009 VT 31, ¶ 13, 185 Vt. 629, 971 A.2d 665 (mem.) (nine-month delay sufficient to trigger review). We therefore must balance the length of the delay along with the other factors.

¶ 20. The next factor is the reason for the delay. In this case, there were three distinct periods of delay: the period up to and including the first trial, from March 2010 to March 2011; a period of inactivity from the mistrial until the court's status conference and the entry of Attorney Maguire into the case, from March 2011 to August 2011; and the final period of preparation leading up to the second trial, from September 2011 to February 2012.

¶ 21. The first period lasting one year would have fallen within normal limits for trial preparation had it resulted in a verdict. Instead, it was "lost time" since the mistrial left both sides without a resolution. But the time lost due to the mistrial cannot be attributed to either the prosecution or the defense. Genuine

difficulties developed with the process of ASL interpretation. While the responsibility for providing adequate interpretation services lies with the government, this delay was for neutral reasons and does not weigh in defendant's favor. See *Barker*, 407 U.S. at 531.

¶ 22. As to the second period, the five-month delay between the mistrial and the court's August 2011 status conference is attributable to the court and the prosecution. The State concedes that this period of delay weighs in favor of defendant's motion to dismiss.

¶ 23. ■ The final six-month period is largely attributable to the substitution of defense counsel and the need to develop a team of ASL interpreters. These factors required the court to cancel trial dates in October and December 2011 before finally convening the trial in February 2012. The reasons for the final six-month delay are either neutral (i.e., the time required to obtain multiple ASL interpreters) or attributable to the defense (i.e., Attorney Maguire's scheduling conflict in another serious felony case and his need for time to study defendant's substantial case file). See *Brillon*, 556 U.S. at 94 ("[D]elays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned.").

¶ 24. The third factor, the extent to which defendant asserted his right to a speedy trial, weighs in defendant's favor, but not heavily. Defendant filed a motion to dismiss in August 2011 at the status conference after the five-month hiatus. Coming as it did almost a year and a half after arraignment, the motion was neither too early (prior to any reasonable perception of undue delay) nor so late as to suggest a waiver or abandonment of speedy trial rights. Raising the issue at the appropriate time, however, does not change the duration of the delay or its reasons. The primary result is that the defense does not lose ground by seeming to acquiesce in the delay. As the entries from the trial court indicate, after the speedy trial issue was raised in August 2011, the court and the parties remained conscious of defendant's position that the case should be brought to trial for a second time without further delay. Defendant preserved the issue in his motion to dismiss, but this is not a case in which repeated calls for a trial went unanswered. After August 2011, the record shows steady progress towards the second trial some six months later.

¶ 25. ▮ Nor does the fourth factor, the prejudice to defendant, strongly favor defendant. As we have noted in the past, the prejudice caused to a defendant through delay is difficult to prove. *Brillon*, 2008 VT 35, ¶ 48. Defendant does not claim to have suffered some objectively demonstrable prejudice such as the unavailability of a witness or the loss of other evidence. Delay can weigh at least as much against the prosecution, which bears the burden of proof and the greater risk of forgetful or confused witnesses. *Barker*, 407 U.S. at 521. But the notion that a defendant is prejudiced by delay even if he — like this defendant — is out on bail is inherent in the very guarantee itself. Whether the prejudice is described in positive terms such as anxiety and stress or in negative terms such as the loss of testimony or evidence which the defense may not even know is lost, it is plain that it was disadvantageous to defendant to be called to trial two years after the alleged offense. See *Barker*, 407 U.S. at 532 (identifying "the possibility that the defense will be impaired" as "the most serious" form of prejudice caused by delay).

¶ 26. Defendant's principal claim regarding prejudice is that the memory of witnesses had deteriorated over time. However, the examples pointed to by defendant are relatively minor. The principal issue in the case was the credibility of the complaining witness, and there is no claim that by the time of the second trial, she had forgotten the events which constituted the sexual assault or her other activities on the day of the crime. The record contains evidence of no more than a moderate degree of prejudice to defendant caused by the twenty-three months between arraignment and the second trial.

¶ 27. ▮ In balancing these four factors, we note that the only delay that was clearly attributable to the State was the relatively short five-month period after the mistrial. The first year of delay was due to neutral reasons, namely the original period of preparation and the mistrial. The final six months of delay was largely attributable to the second defense attorney's legitimate need to prepare for trial. While defendant asserted his right to a speedy trial at the appropriate time, this must be balanced with the facts that he was out on bail for the entire period of delay and has identified few specific claims of prejudice. Under these circumstances, we conclude that defendant was not deprived of his right to a speedy trial.

## II. Prosecutorial Misconduct Claims

¶ 28. ▮▮▮ Defendant next claims that the trial court erred by permitting the prosecution to engage in emotional appeals to the jury in three separate instances during closing argument. In determining whether reversal is warranted due to an allegedly improper closing argument, we consider both whether the argument was improper and whether it "impaired the defendant's right to a fair trial." *State v. Hemond*, 2005 VT 12, ¶ 11, 178 Vt. 470, 868 A.2d 734 (mem.) (quotation omitted). In considering the second element, we look at the following "nonexclusive" factors:

> the blatancy of the challenged statement, the impact on the theory of the defense, the persistence and frequency of the statement, the opportunity for the court to minimize potential prejudice, the strength of the evidence support- ing the relevance of the statement, the overall strength of the State's case, the apparent motivation for making the remarks, and whether the statement was inflammatory and attacked defendant's character.

*Id.* ¶ 12 (citations omitted). In short, we weigh the statements in the context of the trial as a whole and not in isolation.

¶ 29. The first allegedly improper statement identified by de- fendant occurred during the final moments of the State's closing argument, when the prosecution delivered the following appeal to the jury:

> STATE: Folks, the state has the burden to prove beyond a reasonable doubt that [defendant] sexually assaulted [the complaining witness]. You have that. You've heard her testimony. You've witnessed her demeanor. She's lived with this for two years. Help to show [her] that there is justice.

> MR. MAGUIRE: Objection.

> THE COURT: Overruled. Overruled.

> MR. SHOVE: Return a verdict of guilty. Thank you.

¶ 30. ▮▮▮ The general rule is that counsel "should confine argument to the evidence of the case and inferences that can properly be drawn from it." *State v. Karov*, 170 Vt. 650, 653, 756 A.2d 1236, 1239 (2000) (mem.) (quotation omitted). Counsel must

avoid appealing to the prejudice of the jury, and should not "play on the jury's sympathy or seek to inflame their passions." *State v. Blakeney*, 137 Vt. 495, 504, 408 A.2d 636, 642 (1979), *abrogated on other grounds by State v. Trombley*, 174 Vt. 459, 807 A.2d 400 (2002) (mem.). Such conduct may require a new trial in the proper case. *Id.*

¶ 31. ■ ■ A call for justice may be acceptable when it is directed to the jurors' duty to do justice in a general sense. See *State v. Nguyen*, 172 P.3d 1165, 1172 (Kan. 2007) (noting that "it is permissible, if not expected, for a prosecutor to argue for justice in general"); *State v. Evans*, 586 N.E.2d 1042, 1051 (Ohio 1992) (stating that "[t]here is nothing inherently erroneous in calling for justice"). However, an appeal to the jurors to do justice on behalf of the victim or the local community is generally viewed as unprofessional and improper. See *State v. Bible*, 858 P.2d 1152, 1206 (Ariz. 1993) (holding that it was improper for prosecutor to tell jury that victim had rights and that the jury had to protect those rights as well as the defendant's rights); *State v. Camacho*, 924 A.2d 99, 133 (Conn. 2007) (holding that prosecutor's "references to the voices of the victims crying out for justice and to their grieving relatives clutching memories of the past" were improper); *State v. Martinez*, 236 P.3d 481, 497 (Kan. 2010) (ruling that it was improper for prosecutor to ask jury to let the minor victim of attempted rape know that "she did the right thing" in reporting the alleged crime). Such arguments are very close to emotional calls for sympathy and vindication for victims. Since the prosecutor speaks with great authority on behalf of the state as a whole, he or she should not suggest to the jury that their role is to take sides with the victim. The prosecutor's invitation to the jury to "show [the complaining witness] that there is justice" was an improper appeal to the jury's sympathies.

¶ 32. Viewed in the broader context of the trial, however, it was harmless error for the trial court to overrule defendant's objection to the prosecutor's comment. The statement was uttered in the course of a much longer recitation of the facts and was not part of a broader theme. As a rhetorical exhortation, it had no connection to the facts of the case. It was expressed in the nature of a flourish — overly excited, isolated, and not repeated. In reviewing the impact of the two sentences concerning the victim's wait for justice, we conclude that it is clear beyond a reasonable doubt that the statements were not sufficiently prominent to have

affected the jury's verdict. *State v. Mumley*, 2009 VT 48, ¶ 20, 186 Vt. 52, 978 A.2d 6.

¶ 33. ■ The second allegedly improper statement was made by the prosecutor in rebuttal to defendant's closing argument. In attacking the complaining witness's credibility, defendant argued that the record showed that the witness had sent thirty-seven calls or text messages to her friends in the hours following the crime while she was working with defendant, demonstrating that she was not frightened of him and that the intercourse had been consensual. The witness denied sending the calls and text messages. In rebuttal, the prosecutor argued that the calls and text messages may have resulted from inadvertent dialing:

> Mr. Maguire has argued before you today that [the complaining witness] has lied. And as I indicated earlier, that's not true. A lie is an intentional misrepresentation of the truth. [She] owns the one about the marijuana. Everything else is interpretation of language.

> One of the pieces of evidence that you're going to have is a printout of a phone record. Shows a number of phone calls or text messages that were sent from the phone that belonged to [the complaining witness] to her friend. [She] has testified here adamantly that she did not make those phone calls — or send those texts. The defense — their argument is it's her phone, her phone calls. Most everybody I know has a phone, a cell phone and I can't think of a single person that hasn't ever butt dialed. It happens. I'm not going to try to convince you that all of those phone calls were accidental. [She] sat on her phone. I simply put before you that just because there was a message sent from the phone to someplace else and the phone belonged to [her] is not conclusive that she was using the phone at the time.

Defendant did not object to this line of argument. Accordingly, we review for plain error. *Hemond*, 2005 VT 12, ¶ 14. This standard requires "a showing that the error strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." *State v. Ayers*, 148 Vt. 421, 426, 535 A.2d 330, 333 (1987).

¶ 34. ■ The prosecutor's statements that inadvertent dialing "happens" and that the prosecutor knows lots of people who have

had this experience were improper. See *Karov*, 170 Vt. at 653, 756 A.2d at 1239 (stating that counsel "should confine argument to the evidence of the case and inferences that can properly be drawn from it") (quotation omitted). The argument was not based on testimony. The experience of other people who have bumped or sat on their phones is irrelevant without some foundational testimony about how the phenomenon could explain the complaining witness's thirty-seven calls and texts.

¶ 35. However, this is not a case in which the prosecutor's misconduct violated a fundamental constitutional guarantee or resulted in a miscarriage of justice. Evidence about the cause or frequency of inadvertent dialing could have been admitted. The argument was sloppy and improvisational, but the subject itself would have been appropriate if properly introduced through testimony. Even the prosecutor's embrace of his last-minute theory was qualified: "I'm not going to try to convince you that all of those phone calls were accidental." The court instructed the jury to base its decision solely upon the evidence. Under these circumstances, the prosecutor's statements do not rise to the level of fundamental misconduct required by the "plain error" standard.

¶ 36. ▮▮▮▮ The third allegedly improper statement was the prosecutor's argument that the thirty-year disparity in age between defendant and the complaining witness made it unlikely that she would consent to have sex with him. Our review of this statement is also limited to plain error, because defendant failed to object to it during trial. *Hemond*, 2005 VT 12, ¶ 14. Defendant argues that this was an unfair or discriminatory argument. We disagree. The prosecutor pointed out the difference in age as circumstantial evidence against the defense of consent. It was an appropriate argument in this case because the difference in age between defendant and the complaining witness, defendant's marital status, and his family connection to the complaining witness through marriage all militated against a consensual romantic relationship.

*Affirmed.*