NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 40

No. 21-AP-275

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Joshua Boyer | November Term, 2022 |

Cortland Corsones, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, Dawn Seibert, Appellate Defender, and Jackson Samples,
   Appellate Clerk (On the Brief), Montpelier, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Eaton, Carroll and Waples, JJ., and Burgess, J. (Ret.),
                  Specially Assigned

¶ 1.    **WAPLES, J.**    Defendant Joshua Boyer challenges the denial of his motion to suppress evidence gathered in a consented-to search of his residence. He argues that his fourteen-year-old daughter M.B. lacked authority to consent to the search. Defendant also asserts that his constitutional speedy-trial rights were violated. Because we conclude that the search was lawful and that defendant's speedy-trial rights were not violated, we affirm the trial court's decision.

I.  Facts and Procedural History

¶ 2.    The trial court made the following findings in ruling on defendant's motion to suppress. In April 2018, M.B. complained to police that defendant had sexually assaulted her multiple times, including the previous day. M.B. resided in the house where the alleged assaults

occurred with defendant, his wife, and other children. Defendant was arrested and released on conditions, including that he should not return to the family home where M.B. was then residing.

¶ 3. Several days later, a police detective and an investigator from the Department for Children and Families (DCF) met with M.B. at a friend's home where she was temporarily staying and asked if there might be DNA evidence present in M.B.'s family home. M.B. said that defendant might have disposed of a condom in her bedroom wastebasket and used a pair of her underwear to wipe himself off after the assault. Knowing that defendant and his wife would likely be away from their home to attend defendant's arraignment, the detective asked M.B. if she would be comfortable returning to the house to locate this potential evidence.

¶ 4. M.B., the detective, and the DCF investigator then went to the home. They entered through the rear basement door, and M.B. led them to her bedroom, where she noticed her laundry had been cleaned and her wastebasket emptied. M.B. went outside and opened a trashcan by the exterior of the house, which she noted "had been gone through." The detective seized the trashcan. The police later searched the trashcan pursuant to a warrant, which revealed a condom wrapper, stained paper towels, pharmacy receipts, and a rug. M.B. identified the rug as from her bedroom, and a subsequent forensic analysis confirmed the presence of defendant's semen on the rug. Defendant moved to suppress all evidence retrieved from the trashcan as obtained in violation of his constitutional rights under both Article 11 of the Vermont Constitution and the Fourth Amendment to the U.S. Constitution, prohibiting unreasonable searches and seizures.

¶ 5. The trial court denied defendant's motion to suppress. It found that the search had been consented to, and therefore the search fell within an exception to the warrant requirement. It determined that a minor third-party can consent to a warrantless search of their parent's house if the minor has common authority over the home, which the court deemed to be the case here with M.B. The trial court stressed that although "common authority" is not a property interest, it can be inferred from an apparent authority of possession.

¶ 6.     The trial court found that M.B. lived fulltime on the premises and had joint access to the house, providing the reasonable inference that she had the right to permit the inspection "in [her] own right." The court also found widely shared social expectations established that parents, such as defendant, assumed the risk that minors of a certain age would allow strangers to enter the common areas of the house. Finally, it found that although police conducted the search while defendant and his wife were away, they did not remove defendant from the home in order to avoid his objections to the search. In light of the considerations outlined above and based on the totality of the circumstances, the trial court determined that no constitutional violation had taken place and denied the motion to suppress the evidence obtained from the trashcan.

¶ 7.     In August of 2020, defendant filed a motion to dismiss for lack of speedy trial and denial of due process. The trial court denied the motion after applying all the factors from Barker v. Wingo, 407 U.S. 514, 530-32 (1972), as described in more detail below.[*] A jury convicted defendant of sexual assault of a child at his second trial in August 2021. This appeal follows.

## II.  Search and Seizure

¶ 8.     We first address defendant's motion to suppress. "The denial of a motion to suppress involves a mixed question of fact and law. We accept the trial court's findings of fact unless they are clearly erroneous, but we review the question of whether the facts meet the proper legal standard without deference to the trial court." State v. Calabrese, 2021 VT 76A, ¶ 19, 216 Vt. 84, 268 A.3d 565.

¶ 9.     Article 11 of the Vermont Constitution, like the Fourth Amendment to the U.S. Constitution, seeks to "protect our freedom from unreasonable government intrusions into . . . legitimate expectations of privacy." State v. Bauder, 2007 VT 16, ¶ 10, 14, 181 Vt. 392, 924 A.2d 38 (quotations omitted). However, our analysis is independent of "[t]he [U.S.] Supreme

_____

[*] Defendant does not renew his due-process argument on appeal, so we do not address it here.

Court's ebbs and flows in this area of criminal constitutional procedure," and we have often noted that Article 11 "may afford greater protection of individual rights" than its federal counterpart. State v. Savva, 159 Vt. 75, 84, 616 A.2d 774, 779 (1991); see State v. Zaccaro, 154 Vt. 83, 87, 574 A.2d 1256, 1259 (1990) (noting that "we may look for guidance to persuasive holdings from federal and sister-state jurisdictions" in carrying out Article 11 analysis). Searches outside the judicial process are presumptively unconstitutional, aside from "a few narrowly drawn and well-delineated exceptions." Bauder, 2007 VT 16, ¶ 14. In considering defendant's arguments, we recognize that "[t]he home is a repository of heightened privacy expectations, and as such, it receives heightened protection under Article 11." State v. Ford, 2010 VT 39, ¶ 10, 188 Vt. 17, 998 A.2d 684 (quotation omitted). "Evidence obtained in violation of the Vermont Constitution, or as a result of a violation, cannot be admitted at trial as a matter of state law." State v. Badger, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982).

¶ 10. Consent to search is a well-established exception that vitiates the need for either probable cause or a search warrant when given by someone voluntarily and with the authority to consent. State v. Williams, 2020 VT 91, ¶ 8, 213 Vt. 334, 246 A.3d 960. This includes third parties, who may provide valid consent so long as the consenting party could have permitted the search in their own right and the defendant has assumed the risk that a third party might allow a search. State v. Chenette, 151 Vt. 237, 250, 560 A.2d 365, 374 (1989) (applying third-party consent doctrine where State retrieved defendant's documents by consent of third-party managing them); see also United States v. Matlock, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."). Here, defendant primarily challenges the constitutional adequacy of M.B.'s consent to search the house, arguing that she did not have the requisite authority to do so.

4

¶ 11. Defendant first argues that M.B. did not have common authority over the home to consent to a warrantless search. A person has common authority where there is a "mutual use of the property by persons generally having joint access or control for most purposes." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (quoting Matlock, 415 U.S. at 171 n.7). Defendant argues that because children typically have less authority in the home, there should be a presumption against their ability to invite guests in, even where the party seeking entry is a police officer. Defendant cites a concurring opinion in United States v. Sanchez in support of his position. 608 F.3d 685, 698 (10th Cir. 2010) (Lucero, J., concurring).

¶ 12. We decline to adopt such a presumption for the following reasons. First, searches undertaken outside of the normal judicial process are already presumptively unconstitutional, Bauder, 2007 VT 16, ¶ 14, "and consequently the State has the burden of proving that such a search does not violate Article 11." State v. Kirchoff, 156 Vt. 1, 13, 587 A.2d 988, 996 (1991); see also Savva, 159 Vt. at 80, 616 A.2d at 776 ("[T]he state bears the burden of showing that circumstances require that they forego the warrant process."). An additional presumption of the kind advocated by defendant would be redundant and provide little supplementary protection to defendants under the third-party doctrine. Furthermore, the totality-of-the-circumstances test employed by the trial court properly considered a variety of factors relating specifically to a minor's ability to consent to a search, including their age, residence, scope of consent, and authority to permit inspection. In fact, this multi-factor analysis comports with the spirit of Judge Lucero's concurrence, which recognizes that "the central assumption of Matlock," that a joint occupant's consent is valid against a co-occupant, "falters when applied to children." Sanchez, 608 F.3d 685, 697 (Lucero, J., concurring). Matlock's evaluation of the hierarchy of occupant authority becomes much more workable when applied to minors where, as here, the totality of circumstances is considered to evaluate whether a minor can validly consent to a search.

¶ 13.   As the U.S. Supreme Court recognized in Georgia v. Randolph, evaluation of consent "is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests."  547 U.S. 103, 111 (2006). In implicitly acknowledging the varying degrees of authority that may be exercised by co-inhabitants consenting to a search, including minors, the Court noted:

> [A] child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman, might well be admitted, but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom.

Id. at 112 (quotation omitted).

¶ 14.   Here, the trial court properly considered the totality of the circumstances in assessing M.B.'s common authority over the home through the lens of widely shared social expectations, as articulated in Randolph.  See 547 U.S. at 111 ("The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations.").  In consideration of this analogous federal caselaw, it arrived at the conclusion that, based on M.B.'s age, experience, and residence, societal expectations regarding children and parents, her relationship to defendant, as well as the scope of the search, M.B. had the requisite common authority over the areas searched to provide valid consent.  We see no error in the legal analysis undertaken by the trial court here.

¶ 15.   Defendant next argues that the trial court erred in finding that M.B. "lived full time on the premises and had joint access to the house" because, at the time of the search, M.B. was staying with a friend.  We will only disturb the court's factual findings "when, taking the evidence in the light most favorable to the prevailing party, . . . the findings are clearly erroneous."  Brouha v. Postman, 145 Vt. 449, 451, 491 A.2d 1038, 1039 (1985).  There is ample support for the court's finding in the record here.  In tacit recognition of M.B.'s residence, defendant's conditions of

6

release forbade him from returning to the family home. Additionally, M.B. left a handwritten note advising that she would "be back" and not to worry about her. The fact that M.B. had a permanent bedroom at the home and continued to store her belongings there also supports M.B.'s residence at, and joint access to, the house.

¶ 16. Defendant attempts to characterize M.B.'s entry into the home essentially as breaking and entering, describing her actions as "circumventing its locked doors and taking the way in through the basement." But the deposition testimony defendant cites indicates that M.B. and the investigators entered the home through an unlocked door at the rear of the house—the entrance she typically used—and proceeded through the kitchen upstairs to M.B.'s bedroom. Similarly, defendant makes much of the fact that M.B. did not have a key to the house, however, there is no indication that she ever did. The record indicates that defendant's wife possessed the only key. In light of the foregoing, we cannot say that the trial court's factual findings as to M.B.'s residence and joint access are clearly erroneous. See Mullin v. Phelps, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994) ("A finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding." (quotation omitted)).

¶ 17. Defendant next challenges the voluntariness of M.B.'s consent, arguing that the State failed to satisfy its burden of proof. Defendant notes that the only evidence presented by the prosecution was M.B.'s affirmative response to the question of whether she would be "comfortable" returning to the house, which he argues is insufficient to demonstrate voluntary affirmative consent. However, consent can be obtained both verbally and nonverbally, and both explicitly and implicitly, including from "conduct which would be understood by a reasonable person as conveying consent." State v. Stevens, 2004 VT 23, ¶ 13, 176 Vt. 613, 848 A.2d 330 (mem.). Here, M.B. travelled to the house with investigators after having a detailed conversation about gathering potential evidence. She led the investigators directly to her room after entering

7

the house, remarked that someone had removed both her laundry and trash, and immediately began looking for these items. This course of conduct—actively assisting in the search for evidence—supports the conclusion that a reasonable person would understand M.B. as consenting to the search.

¶ 18. Defendant cites State v. Allis, where we held that a particular course of conduct was insufficient to convey consent to enter the premises. 2017 VT 96, ¶ 18, 205 Vt. 620, 178 A.3d 993. But the conduct alleged to have conveyed consent there—a single gesture alerting officers to the presence of person of interest in the home—pales in comparison to the course of conduct here, where M.B. affirmatively participated in, and even led, the search. Defendant also asserts that M.B.'s age and inexperience weigh heavily against her consent being voluntary. However, at the time she consented to the search, M.B. had already been interviewed by police numerous times and filed a complaint against defendant for sexual assault. This is not a case where an unknowing child invites the police into her parent's house. M.B. was fully cognizant of the circumstances and the possible consequences of returning to the house with authorities.

¶ 19. Because the search occurred while both defendant and his wife were attending his arraignment, defendant accuses the police of functionally removing them from the home, therefore rendering the search illegal under Randolph. 547 U.S. at 121. In Randolph, the U.S. Supreme Court elaborated on the hierarchy of authority between co-tenants, holding that a co-tenant who is present can provide consent over a co-tenant who may object but is not present, so long as there is no evidence that the absent co-tenant was purposefully removed to stifle their objection. Id. But here, the police did not remove defendant from the house for the purpose of avoiding his objection to the search. Further, as indicated by the trial court, it is immaterial whether investigators knew that defendant would be at his arraignment during this time because his conditions of release prevented him from returning to the house.

8

¶ 20. Although defendant further presses that there was no urgency in undertaking the search, "[a] warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant." Fernandez v. California, 571 U.S. 292, 306 (2014); see Savva, 159 Vt. at 80, 616 A.2d at 776 (holding inspection of closed container inside arrestee's vehicle required warrant unless consent provided, or exigent circumstances existed). Further, the officer here obeyed the Court's mandate in Savva by seizing the trashcan and applying for a warrant before searching the contents. See Savva, 159 Vt. at 90, 616 A.2d at 782 ("The obvious, and correct, alternative is that the choice between an immediate search and a temporary seizure while a warrant is sought belongs to the person whose constitutional interests are at stake." (quotation and brackets omitted).

¶ 21. Finally, defendant seems to be encouraging this Court to adopt a standard that precludes any minor from providing consent to search or seizure based on a waiver of fundamental rights. He first argues that M.B.'s consent was rendered involuntary because the police did not adhere to the protections established in In re E.T.C., 141 Vt. 375, 379, 449 A.2d 937, 940 (1982). There, we determined that a consultation with a disinterested adult as well as a knowing and intelligent waiver is required where a minor relinquishes their own fundamental rights, such as the right against self-incrimination or to the assistance of counsel. Id. This is not the case here. Defendant is mistaken about the standard applied to consent in search-and-seizure cases. Unlike the "knowing and intelligent" waiver required for other constitutional rights, "the inquiry in a consent[-]search context is restricted to whether the consent was voluntary." Zaccaro, 154 Vt. at 88, 574 A.2d at 1259 (quotation omitted).

¶ 22. Further, third-party consent in the context of a search does not rest upon the third party's waiver of another's constitutional rights, but upon the occupant's waiver of their own privacy. Chenette, 151 Vt. at 249, 550 A.2d at 374 (declining to find unconstitutional search "not because his rights were waived by the third party, but because he has relinquished his privacy"

9

(quotation omitted)). Here, M.B.'s consent was well within the limits of her socially perceived authority, allowing callers entrance to the common areas of the house as well as her bedroom. See Randolph, 547 U.S. at 111-12 (noting relationship between age, maturity, and societal expectations of authority over domicile in determining third-party consent). Defendant's assertion that a minor cannot waive the constitutional rights of their parents fails for the exact same reason as in Chenette. 151 Vt. at 249, 550 A.2d at 374.

¶ 23. Defendant also encourages us to adopt a multi-factor test used in Florida which defendant asserts protects the interests of minors. See Saavedra v. State, 622 So. 2d 952, 957-58 (Fla. 1993) ("In applying the Matlock test, Florida courts should focus on whether the police officer had a reasonable belief based on articulable facts that the minor shared joint authority over the home with the parent." (emphasis omitted)). We see no need to do so given that the factors used in that test are essentially the same as the factors used by this Court and also the federal courts. Both sets of factors revolve around the minor having common authority to authorize a search, which the officer reasonably believes the minor to possess, and the minor freely giving consent. Regardless of whether we call these factors the "Florida test" or the "Vermont test," the factors have been satisfied here. Thus, for the reasons articulated above, defendant's rights under Article 11 were not violated by the warrantless search of defendant's residence.

### III. Speedy Trial

¶ 24. We thus turn to defendant's speedy-trial claim. Defendant argues the trial court erred in refusing to dismiss the charges. While the court found the total length of delay sufficient to warrant consideration of all the Barker factors in the speedy trial analysis, it ultimately denied defendant's request. The trial court found that there was no intent on the part of the State to delay the proceedings and that the majority of delays were attributable to the complexity of the case, motion practice, and discovery. It added that much of the delay in defendant's adjudication was

caused by the court's response to the COVID-19 pandemic which, although attributed to the government, was neither intentional nor unwarranted.

¶ 25. On review, we will uphold the trial court's findings unless clearly erroneous and review its legal conclusions de novo. State v. Turner, 2013 VT 26, ¶ 6, 193 Vt. 474, 70 A.3d 1027. In evaluating speedy-trial claims, this Court applies the four-part balancing test set forth in Barker, 407 U.S. at 530-32. See, e.g., State v. Unwin, 139 Vt. 186, 195, 424 A.2d 251, 256 (1980); State v. Snide, 144 Vt. 436, 442, 479 A.2d 139, 143 (1984). This test requires courts to weigh the conduct of the prosecution and the defendant while examining: (1) the length of delay; (2) the reason for the delay; (3) the extent to which the defendant asserted the speedy-trial right; and (4) any prejudice that accrued to the defendant as a result of the delay. Barker, 407 U.S. at 530-32. The first factor serves a dual role in our analysis, and as a threshold matter, requires finding a sufficiently long period of delay as to trigger examination of the other factors. State v. Young, 2023 VT 10, ¶ 10, __ Vt. __, 292 A.3d 689. If a sufficient delay is found, we balance the length of the delay along with the other factors to determine whether the defendant's speedy-trial rights have been violated. State v. Reynolds, 2014 VT 16, ¶ 19, 196 Vt. 113, 95 A.3d 973; State v. Lafaso, 2021 VT 4, ¶ 12, 214 Vt. 123, 251 A.3d 935.

¶ 26. In weighing the length of the delay, the court evaluates "the extent to which the delay stretche[d] beyond the bare minimum needed to trigger judicial examination of the claim" within the context of the case as a whole. State v. Vargas, 2009 VT 31, ¶ 12, 185 Vt. 629, 971 A.2d 665 (mem.) (quoting Doggett v. United States, 505 U.S. 647, 656 (1992)); see also Lafaso, 2021 VT 4, ¶ 12 (noting that "this threshold test is dependent upon the peculiar circumstances of the case" and tolerable period of delay for complex case will be longer than for less complex offense (quotation omitted)). For example, in Vargas, this Court found a nine-month delay sufficient to invoke examination of the remaining factors in a lewd-and-lascivious-conduct case. 2009 VT 31, ¶ 13. In Reynolds, this Court found that a twenty-three-month delay in a sexual

11

assault case warranted evaluation of the remaining <u>Barker</u> factors. 2014 VT 16, ¶ 19. In considering the length of delay, pretrial motions and continuances requested by defendant are excluded. <u>State v. Williams</u>, 143 Vt. 396, 401, 467 A.2d 667, 670 (1983).

¶ 27. In evaluating the reasons for the delay, more neutral reasons should be given little weight where a deliberate attempt to delay the trial should be weighed heavily against the State. <u>Barker</u>, 407 U.S. at 531. Courts assess the extent to which a defendant invoked their speedy-trial right in consideration of defendant's aggressiveness in invoking the right and acquiescence to long delays, as well as the length of time before defendant's first invocation. <u>Id</u>. at 529; <u>Young</u>, 2023 VT 10, ¶ 18 ("A delay in asserting the right to a speedy trial weighs against the accused."). Finally, courts look to potential prejudice to a defendant, considering their interests "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." <u>Barker</u>, 407 U.S. at 532. None of the four factors is determinative on its own of a violation of the speedy-trial right. <u>Id</u>. at 533.

¶ 28. Here, the State concedes, and we agree, that the length of defendant's pretrial incarceration, approximately 1197 days, satisfies the threshold inquiry, allowing us to consider it along with the remaining factors outlined in <u>Barker</u>. 407 U.S. at 530; <u>Reynolds</u>, 2014 VT 16, ¶ 19. However, 562 of those days encompass the time leading up to defendant's first trial and cannot be considered an egregious length of time for pre-trial incarceration when ordinary trial preparation and the complexity of this case are considered. Further, another 519 days reflects the time in which jury trials were suspended by A.O. 49 in response to the COVID-19 pandemic, which although still attributable to the State, represented a unique logistical challenge. <u>Young</u>, 2023 VT 10, ¶ 12. In considering the length of delay against the backdrop of the circumstances of this particular case, this factor does not weigh heavily in defendant's favor. However, the length of delay alone is rarely dispositive as "it is impossible to determine with precision when the right to speedy trial has been denied" because such a constitutional guarantee "cannot be quantified" into a bright-line rule

but depends on the surrounding circumstances. State v. Recor, 150 Vt. 40, 42, 549 A.2d 1382, 1384 (1988) (quotations and brackets omitted).

¶ 29. Defendant argues that because the delay is largely unattributable to himself, the second factor weighs in his favor for the purposes of finding a speedy-trial violation. Defendant elaborates that blame for the delays caused by deposition scheduling and the circumstances of the first mistrial must be laid at the feet of the State. Here, the jury draw was delayed multiple times so the court could respond to several pretrial motions, including defendant's motion to suppress, motion for depositions, and his request for a "pick and go" trial. This delay is attributable to the trial court's accommodation of "the ordinary needs of trial preparation," especially when the complexity of a sexual-assault case, such as this, is considered. Lafaso, 2021 VT 4, ¶ 24. Defendant's first jury trial was held in November of 2019 but resulted in a mistrial due to juror misconduct. However, as we noted in Reynolds, "the time lost due to the mistrial cannot be attributed to either the prosecution or defense" and is most aptly characterized as "lost time," having left both sides with no resolution. 2014 VT 16, ¶ 21 (quotation marks omitted). Another jury draw was scheduled for February 2020, but by then, the onset of the COVID-19 pandemic had shuttered most of the country, resulting in the issuance of AO 49, the following month, which suspended all upcoming jury trials.

¶ 30. Defendant further insists that because the judiciary suspended jury trials pursuant to AO 49 in response to the pandemic, this delay is necessarily attributable to the State. While we have previously noted in a bail appeal that "the government bears the responsibility of bringing defendant to trial, even when it is delayed . . . by a public health emergency," State v. Labrecque, 2020 VT 81, ¶ 26, 213 Vt. 635, 249 A.3d 671 (mem.), we have subsequently held that "the delay in bringing defendants to trial during the pandemic was an extraordinary moment in modern history that presented unprecedented 'logistical challenges' that were neither intentional nor unwarranted, and ultimately the pandemic represents a 'more neutral' reason under Barker's

13

second factor." Young, 2023 VT 10, ¶ 17. Thus, while the delays caused by the COVID-19 pandemic are necessarily attributable to the State, they bear minimal weight. State v. Labrecque, 2023 VT 36, ¶ 28, __ Vt. __, __ A.3d __; Young, 2023 VT 10, ¶¶ 14, 17. Additionally, where we find no indication that "periods of delay attributable to the State were deliberate," the weight we assign to those delays is limited. Lafaso, 2021 VT 4, ¶ 24. Accordingly, because the delays caused by COVID-19 bear minimal weight and the remainder of delays were caused by ordinary trial practice consistent with the complexity of this case, this factor only minimally weighs in defendant's favor.

¶ 31. Next, defendant contends that he continuously asserted his speedy-trial rights as considered under the third Barker factor. Turner, 2013 VT 26, ¶ 11. "Aspects we consider when weighing this factor include defendant's knowing failure to object to delays, acquiescence in long delays, failure to object to motions to continue, and the 'frequency and force' of the accused's speedy-trial objections." Young, 2023 VT 10, ¶ 18 (quotation omitted). Defendant first asserted his desire for trial "as soon as possible" after his mistrial at a June 2020 status conference before filing a formal motion in August of 2020, almost two-and-a-half years after he was charged and five months after Administrative Order 49 suspended jury trials. In total, defendant raised his speedy-trial concerns approximately five times: twice verbally at status conferences, once briefly in a motion to exclude, once in his formal motion for speedy trial, and once in a motion to dismiss, but all after the suspension of jury trials and all within the same twelve-month period.

¶ 32. As we noted in Lafaso, consideration of the "frequency and force" of defendant's objections necessarily requires us to consider the "aggressiveness with which" and "extent to which" defendant asserted the right. 2021 VT 4, ¶ 27 (quotation omitted); see also id. ¶ 29 (noting multiple motions demanding trial constitute "strong showing" defendant asserted speedy-trial rights while motions to dismiss and objections to continuances are "more feeble"). Here, defendant's tepid signals that he was ready for trial do not amount to a showing that he zealously

14

asserted the right. Defendant filed only a single written demand for trial, accompanied by a motion to dismiss. Upon their denial, defendant only raised the specter of an immediate trial one more time at a June 2021 pretrial conference. Thus, in consideration of defendant's delay in asserting the right and failure to do so until after the issuance of AO 49, any weight in his favor under this factor is minimal.

¶ 33. Finally, defendant contends that he suffered substantive prejudice due to the delay. Defendant starts by arguing that "affirmative proof of particularized prejudice is not essential," citing Doggett, 505 U.S. at 656. In Doggett, the U.S. Supreme Court recognized that the fourth Barker factor could be satisfied by a showing of nonparticularized prejudice—a presumptive prejudice based on generalizations—where the State was not able to rebut that presumption. Doggett, 505 U.S. at 658. However, because the defendant did not argue he suffered from presumptive nonparticularized prejudice in the trial court, providing the State with an opportunity to rebut his claim, he has waived that argument on appeal, and we will not consider it. Progressive Ins. Co. v. Brown ex rel. Brown, 2008 VT 103, ¶ 6, 184 Vt. 388, 966 A.2d 666 ("[I]n order to rely upon an argument on appeal, an appellant must properly preserve it by presenting it to the trial court with specificity and clarity." (quotation omitted)).

¶ 34. Defendant's claims of prejudice are largely based on the restrictive COVID-19 measures imposed on incarcerated individuals and how those restrictions had an impact on his ability to confer with his attorney. However, aside from describing the oppressive conditions brought about by the pandemic, defendant has failed to articulate any actual prejudice to his defense. Generalizations about how these restrictions affected his interactions with his attorney and the court system, in the absence of a concrete example of hindrance to his defense, are insufficient to prove actual prejudice. See Turner, 2013 VT 26, ¶ 13 ("[A] general allegation . . . is insufficient to establish prejudice." (quotation omitted)). "Without more, defendant's cryptic statement does not serve to establish sufficient prejudice for this factor to weigh in his favor." Id.

15

¶ 35. Defendant has not shown that his speedy-trial rights were violated. While the length of delay weighs minimally in his favor, the additional <u>Barker</u> factors are not particularly favorable to defendant, including the most important factor: prejudice to his defense. Therefore, we decline to vacate his conviction on speedy-trial grounds.

<u>Affirmed</u>.

FOR THE COURT:

_____

Associate Justice